[Crim. No. 291.   Third Appellate District.—April 24, 1915.]

## THE PEOPLE, Respondent, v. FOX BURNS, Appellant.

CRIMINAL LAW—MURDER—EVIDENCE—CONFESSION.—A statement of guilt made by a defendant charged with murder to the sheriff after his arrest, is admissible in a prosecution for such offense as a voluntary confession, notwithstanding that the defendant was informed by the officer prior to the making of the statement that he had interviewed other persons also under arrest for the same offense and had been informed by them that the defendant did the killing, that he already had sufficient evidence to convict the defendant and that the defendant ought to tell the truth.

ID.—EXTRAJUDICIAL CONFESSIONS—ADMISSIBILITY OF.—Evidence of extrajudicial confessions is never admissible unless the prosecution shows, previously to the reception of such confessions, that they were freely and voluntarily made without any previous inducement or offer of leniency in punishment or by reason of any intimidation or threat.

ID.—NATURE OF CONFESSION—QUESTION FOR TRIAL COURT.—Whether a confession is free and voluntary is a preliminary question addressed to the trial court and to be determined by it, and a considerable measure of discretion must be allowed that court in determining the question.

ID.—EVIDENCE—STATEMENT AT CORONER'S INQUEST—ADMISSIBILITY OF. Where the defendant in a prosecution for murder, after a confession of guilt made to the sheriff, appears at the inquest held by the coroner to inquire into and determine the cause of the death of the de-

ceased, and states to the coroner and the jury that he himself had shot and killed the deceased, such statement is admissible in evidence against him at the trial.

Id.—Instructions—Rule Governing—Admissibility of Extrajudicial Admissions.—An instruction to the jury upon the law bearing upon extrajudicial admissions from which the jury could, by reason of the inapt phraseology of the instruction, have obtained the impression that a finding by the court that the confession was true was a necessary legal prerequisite to its admission in evidence, is prejudicial to the substantial rights of the accused, and sufficient to constitute a reversal in a case not within the provisions of section 4½ of article VI of the constitution.

Id.—Self Defense—Inaccurate Instruction.—An instruction which declared it to be the duty of the defendant to have avoided the killing of the deceased if he could have done so with perfect safety to himself or his person, is not prejudicial, where the defendant did not become a witness in his own behalf, and it is shown by the evidence that the defendant in the place of attempting to avoid further trouble after the first altercation, needlessly and purposely put himself in the way of a renewal thereof.

Id.—Plea of Self Defense—When not Available.—An instruction that the plea of self defense is not available to a defendant who has sought a quarrel with a design to force a deadly issue and thus by his own wrongful acts creates a real or apparent necessity for killing his adversary, is a correct abstract statement of law.

APPEAL from a judgment of the Superior Court of Mendocino County and from an order denying a new trial. J. Q. White, Judge.

The facts are stated in the opinion of the court.

T. J. Weldon, and Charles Kasch, for Appellant.

U. S. Webb, Attorney-General, and J. Charles Jones, Deputy Attorney-General, for Respondent.

HART, J.—The defendant, having been charged by information filed by the district attorney of Mendocino County with the crime of murder, was adjudged guilty by the jury of the crime of manslaughter, and he brings the cause to this court on an appeal from both the judgment and the order denying his application for a new trial.

The homicide occurred in a hop-field of a Mr. Hildreth in Mendocino County, on the night of the eighteenth of September, 1914.   ·

The defendant, who is an Indian, with other Indians and a number of white persons, was, at the time of the homicide, engaged in picking hops. It appears that, among those so engaged, was a woman by the name of Rosie Judd. She was living in a tent, a temporary affair, erected for the purpose of use during the hop-picking season. The Indian hop-pickers maintained a camp several hundred yards distant from the tent of the Judd woman.

On the night in question the deceased, Chester C. Rich, who was also a hop-picker and engaged in that work up to the time of the homicide in the Hildreth fields, visited the Judd tent at about ten o'clock on the night of the killing. He was accompanied by one William Mitchell, another hop-picker. Gathered at the Judd tent then were the deceased, Mitchell, a man named Binkley, all three white men, and several Indians. The deceased had a bottle of whiskey in his possession and all then present in the Judd tent drank more or less of the liquor, none of them, however, getting under the influence thereof to any great degree. Within a brief time after the deceased and his companion reached Rosie Judd's tent, Fox Burns, the defendant, put in an appearance. At this time Tony Bell, an Indian, and deceased were engaged in gambling for money at a game known as the "grass game." The deceased accused Bell of cheating at the game and a quarrel followed, each calling the other a s—n of a b—h. Burns, during the game, although not then playing at it, interjected remarks about the playing, when the deceased told him to keep his "d—m mouth shut," and this seems to have provoked an exchange of opprobrious epithets between the two men. A little later, however, the deceased and the defendant played at the game, the latter wagering his hat. The deceased won the game and the hat, but returned the latter to the defendant, saying that he had no use for it. The deceased then challenged Tony Bell for another game, and, accepting the challenge, Bell placed a dollar on the ground, on which, it seems, the game is usually played among the Indians. The deceased thereupon grabbed the dollar and put it into his pocket. Another quarrel between the deceased and Bell ensued, each abusing the other in scurrilous language. Almost immediately after the happening of this last circumstance the defendant, Bell and an Indian named Ed. Switser left the tent,

the defendant preceding the others a few seconds or perhaps a minute. Thereafter and within a very short space of time the deceased and Mitchell and an Indian, Dave Poe by name, started to leave the tent, Poe being a little ahead of the deceased and Mitchell, and, just as they had reached the outside the Judd woman called Mitchell and requested him to return and light her lantern or lamp. Mitchell returned into the tent and the deceased and Poe remained outside. While Mitchell was engaged in the act of lighting the lantern, a shot was fired and Rich received the contents of the weapon and a mortal wound, a rifle ball having entered his abdomen and presumably penetrated the stomach and intestines.

Immediately after the shooting a messenger was dispatched for a physician and Dr. Cleland responded, but found that Rich had expired before his arrival at the scene of the homicide. The doctor made only a superficial examination of the wound—that is, such an examination only as enabled him to ascertain the point of entrance of the bullet into the body.

A hat was lying on the ground a short distance from where the body lay and this the doctor picked up and carried to Ukiah, where later in the day, he delivered it into the possession of the sheriff.

The testimony, while not strictly consistent on some points which may well be characterized as of minor importance, is, generally, marked by no conflict as to the circumstances under which the killing was committed.

The night was very dark and a drizzling rain was falling. Tony Bell testified that, while he and Switser were on their way to the Indian camp and before they had proceeded no farther than forty yards from the tent of Rosie Judd, they met the defendant going in the direction of the Judd tent. At the same time, having looked back, they saw the deceased coming toward them. After the defendant had passed them he heard him (the defendant) say: "Come on out, I'll fix you." He heard no reply to the challenge, but immediately thereafter heard the report of a gun and saw a flash from the explosion, instantly following which he heard the exclamation, "Oh!" in a loud tone of voice and saw the deceased fall to the ground. Someone then hastily fled from the spot and in a direction from Burns's camp.

Dave Poe, an Indian, testified that he was standing on the outside of and near the entrance to the Judd tent when the deceased came out of said tent; that, at that time, Mitchell's lantern was standing on the ground near the tent and was lighted; that he saw Bell and Switser standing together a short distance from the tent and the defendant back of them a short distance; that the deceased, a moment after leaving the inside of the tent and after some words with Poe, picked up a hop pole of about ten feet in length and, with the pole in his hands, started in the direction of the spot where Bell and Switser were standing, saying, as Poe expressed it, "that he was going up to club them fellows out there." The deceased had proceeded only a short distance, said Poe, when a shot was fired and the deceased, with an exclamation, fell to the ground.

Ed. Switser testified that he saw the deceased, with a club in his hands, coming in the direction of where he and Bell were standing, and at the same time heard someone say, "Come on, you s—n of b—h." Thereupon, the witness heard the report of a gun and saw the deceased fall. He said that the voice of the person using the language, "Come on, you s—n of a b—h," he thought was that of the defendant. He said, however, that he did not see the defendant at that time and did not know who fired the shot, but, he said, he heard some one running immediately after the shot, and that whoever he was "went around through the alfalfa field."

The sheriff of Mendocino County testified that, early on the morning following the night of the homicide, he, accompanied by his deputy, Oscar Weger, went to the hop-field and thence to the Indian camp. He found all the Indians, including the defendant, lying on the floor of their cabin asleep. He awoke and proceeded to interrogate them concerning the shooting. He placed several of the Indians, the defendant among them, under arrest. The sheriff had taken with him to the scene of the homicide the hat which, as above explained, Dr. Cleland had found lying near the body of the deceased. When the defendant, after having been aroused from his sleep by the sheriff, had finished "dressing," that officer asked him if he had a hat, to which question he replied in the negative. The sheriff then showed him the hat referred to and asked him if it was his, and he replied that it was and received it from the sheriff and placed it upon his head.

The Indians were taken to the county jail at Ukiah and, shortly thereafter and on the same day, in the office of the sheriff, the latter and his deputy interviewed the other Indians and finally the defendant about the killing of Rich and sought to secure a statement from the latter of what he knew of the homicide. After some little time, it appears, the sheriff, having asked the defendant what disposition he had made of his rifle (no weapon having been found in the defendant's camp at the time of the arrest), the accused replied that he had thrown the gun in the brush near the scene of the shooting. Later in the day the sheriff and his deputy, accompanied by the defendant, started for the hop-field. On the way out, the defendant, although up to that time stoutly denying any knowledge of the shooting or the identity of the author of it, said to the officers: "You white men would do the same thing, too, if us Indians come around you bothering your women— you would kill us, too." Arriving at the hop-field, the defendant guided the officers to a point in the brush, about seventy-five yards from the Judd tent, and himself went into the brush and found and delivered to the sheriff a rifle. While out on this trip the defendant, so the sheriff testified, "told us all about it," referring to the killing. The sheriff further testified that the defendant, at the coroner's inquest, testified that he shot and killed Rich.

Deputy Sheriff Weger corroborated the sheriff upon what occurred between the sheriff and the defendant at the first interview in the sheriff's office and as to the finding of the gun and the circumstances thereof. This witness said that he really heard no confession of guilt by the defendant either on the way to the hop-field or on their way back to Ukiah; but, he said, the defendant repeatedly spoke about going to San Quentin, saying, among other things, that, as he had to work anyway, he might as well work at that prison as elsewhere.

Both the sheriff and his deputy testified that the gun or rifle, when found in the brush, contained one empty shell and two cartridges.

The above constitutes a statement in substance of the more important testimony produced by the people in support of the charge set forth in the information, and, while no claim is here made that the evidence is not sufficient to uphold the verdict, thus we have presented the testimony here for the purpose

of the consideration and decision of certain points made by the defendant in support of his appeals.

The defendant himself did not take the witness-stand, but introduced some proof tending to establish his position in the case that the deceased was a man of bad reputation for peace and quiet—that is, that he was. of a quarrelsome and pugnacious disposition, particularly when under the influence of intoxicating liquor, in which condition to some extent there was some testimony showing the deceased to have been when the homicide occurred. He also introduced some testimony tending to show that he himself was a person of good reputation for the traits mentioned.

The first point made by the defendant is that the court erred in allowing in evidence the alleged confession of the defendant to the sheriff, the claim being that it was extorted from the accused by illegal means and was, therefore, involuntary.

As has been shown, the sheriff brought the defendant into his office shortly after the arrest and questioned him about the shooting. Previously that officer had interviewed the other Indians under arrest upon the subject, and the sheriff said to the defendant that those Indians had told him that he (the defendant) fired the fatal shot, that he (the sheriff) already had sufficient evidence to convict the defendant, and that the latter ought to tell the truth. The sheriff denied making any threats or promises or saying to the defendant that it would be better for him to tell the truth or in any manner using undue pressure in forcing from him an admission of guilt.

We cannot say that the confession was not a voluntary one.

The rule respecting extrajudicial confessions is well understood and it is that evidence of such confessions is never admissible unless the prosecution shows, previously to its reception, that they were freely and voluntarily made and without any previous inducement or offer of leniency in punishment or by reason of any intimidation or threat. (*People* v. *Miller,* 135 Cal. 69, [67 Pac. 12]) ; or, as the proposition is elsewhere expressed, a confession, to be admissible as proof against the accused, must not have been "extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence." (3 Russell on Crimes, 6th ed., 478.)

But, as is said in the case of the *People* v. *Siemsen,* 153 Cal. 387, 394, [95 Pac. 863], "whether a confession is free and voluntary is a preliminary question addressed to the trial court and to be determined by it (*People* v. *Miller,* 135 Cal. 69, [67 Pac. 12]), and a considerable measure of discretion must be allowed that court in determining it." (See, also, *Hopt* v. *Utah,* 110 U. S. 574, 583, [28 L. Ed. 262, 4 Sup. Ct. Rep. 202].)

In the case at bar, there is an entire absence of evidence showing threats or promises, either direct or implied, or the exertion of any improper influence or the employment of any improper means to secure a statement from the accused. Indeed, the circumstances under which the confession was made in this case do not, in our judgment, go as far in impeachment of the confession as evidence against the accused as those under which a confession was obtained from the defendant in the case of the *People* v. *Siemsen,* 153 Cal. 387, [95 Pac. 863]. In that case the accused was told by the police officers, previously to his confession, that they had obtained a confession from one Dabner that the latter and Siemsen had committed the crime of murder, for which they were then under arrest and in the custody of the police. The confession of Dabner had been reduced to writing and, in the presence of Dabner and certain police officers, was, before Siemsen confessed, read to him and after it was so read Dabner remarked to the former, referring to his said confession, "Jack, you know it is true," and this was held to be a voluntary confession.

But it appears that, after this confession of guilt to the sheriff, the defendant was present at the inquest held by the coroner to inquire into and determine the cause of the death of Rich and that he himself stated to the coroner and the jury that he had shot and killed the deceased. It was not shown that the accused was asked to testify at the inquest, nor was it shown that his statement before that tribunal was either the direct or indirect result of anything previously said to him by the sheriff. In any event, he was not, as a matter of law, compelled to testify at the inquest and, in the absence of a showing to the contrary, it must be presumed that he voluntarily appeared before the coroner and freely and without in any sense being coerced so to do admitted that it was he who fired the shot that killed the deceased. It follows that,

even if the incriminatory statement made by the accused to the sheriff was in truth involuntary, the defendant, having himself voluntarily made the same statement before the coroner, cannot now claim that he was prejudiced by the ruling admitting evidence of his confession to the sheriff, assuming (but denying) that said ruling constituted error.

The next objection to the record is based on an oral instruction given by the court to the jury. The instruction was given after the jury had retired for deliberation upon the case and were, by their own request, brought into court for further information upon the law bearing upon extrajudicial admissions. The court then addressed the jury as follows: "When the court admitted the evidence in it did so on the ground that if it were true why the confession was voluntary. If the evidence is true the question for you to determine is whether or not you believe beyond any question that the evidence is true. The court decided that if the evidence is true that the confession is voluntary. If you argue (agree?) upon what Mr. Byrnes (the sheriff) testified to and then if you agree it is true, why the court decided that the confession is voluntary."

The foregoing language appears, on first blush, to be confusing and inconsistent in itself. And upon a mere casual reading of it there would be considerable difficulty in determining precisely what the judge by it intended to say. In one sentence the instruction *appears* to have told the jury that the confession was admitted because the court had found it to be true, which is, of course, not the correct view, for the instruction so understood would involve a plain trespass by the court upon the domain of fact. In another sentence the instruction stated that it was with the jury to determine whether the confession was or was not true, which statement obviously involves the correct view of the law. But a careful analysis of the language of the instruction has brought us to the conclusion that what the judge intended to say was that when the court admitted the confession it did so because the evidence disclosing the circumstances under which it was made was true and thus the confession shown to have been voluntarily made, but that it was for the jury to determine whether the confession itself was made and, if so, whether it involved the truth. The instruction, so interpreted, is legally unobjectionable. It can easily be understood, however,

how the jury could, from the rather inapt phraseology of the instruction, have obtained the impression that a finding by the court that the confession was true was a necessary legal prerequisite to the admissibility of evidence of the confession, and the effect of such an impression would unquestionably be greatly to prejudice the substantial rights of the accused at the trial, and would, under ordinary circumstances, constitute a sufficient legal reason for a reversal of the case.

But, assuming that the jury received from the instruction the impression suggested, still we think the cause should not be reversed therefor in view of the provisions of section 4½ of article VI of the constitution, which, we think, should, under the circumstances of the case, be applied here, and so rescue it from the fate to which it might be carried by said instruction but for that comparatively new amendment to our organic law.

The defendant was charged with the crime of murder and the circumstances proved against him, independent of his confession, were, in our opinion, sufficient to support these findings by the jury had they so found: That the defendant and the deceased had a quarrel and used violent language toward each other in Rosie Judd's tent; that the defendant left said tent before any of the others present therein departed therefrom; that the defendant immediately went to his tent or camp, procured his rifle and returned to within a short distance from the Judd tent and there waited for the appearance of the deceased; that, when the latter emerged from the tent into the darkness, the defendant fired at and inflicted upon the deceased a wound from the effect of which he died; that the defendant hastily fled from the scene of the shooting and returned to his own camp. These circumstances are borne out by the testimony of the witnesses, one of whom testified that Burns stood a few feet back of Bell and Switser when the shot was fired, and that he was heard to say, instantly before the shot was fired, "Come on, you s—n of a b—h," and by the further significant circumstance that his hat, which he was wearing when in the tent of Rosie Judd, was found after the shooting near the spot where lay the dead body of the deceased.

Thus the jury might have justly found the defendant guilty of murder of the first degree; or, to state the proposition differently, a verdict of conviction of murder of the first de-

gree, predicated alone and independently of the confession, upon the circumstances above detailed, would not be set aside on appeal on the ground of the insufficiency of the evidence to support such verdict; for, from thóse circumstances the inference is well-nigh irresistible that the accused had made up his mind to destroy the life of the deceased before he left the Judd tent, that he went to his own camp to procure his rifle for that purpose and that he returned and lay in wait for the deceased for the purpose of executing his previously conceived intent to slay him.

Under this view of the case, so well justified by the record, the defendant was fortunate, indeed, that his very able counsel were successful in saving him from the extreme penalty of the law, and under this view, having given the entire cause, including the evidence, a painstaking examination, we cannot justly conclude, even if the instruction had the effect of conveying to the jury the impression that the court was, before admitting evidence of the confession, required to and did decide that the confession was true, that the instruction so understood "has resulted in a miscarriage of justice." (Const., art. VI, sec. 4½.)

The next proposition upon which a claim of reversal is based grows out of an instruction which declared it to be the duty of the defendant to have avoided the killing of the deceased if he could have done so with perfect safety to himself or his person. It is said that such an instruction was condemned and constituted the ground upon which a reversal was ordered in the case of the *People* v. *Maughs,* 149 Cal. 253, 259, [86 Pac. 187]. The two instructions are not precisely alike, although, perhaps, it might with some reason be said that by the instruction complained of here the same doctrine was intended to be announced as was declared in the Maughs case and which was held to be so far from the correct rule as to demand a reversal of that case. The instruction in that case in effect declared it to be the duty of one accused of slaying another and who relies upon the plea of self-defense, to use, while under attack, all reasonable means within his power, consistent with his safety, "to avoid the danger and avert the necessity for the killing." In other words, the jury were thus told that it was the duty of the defendant, although under attack, to flee rather than to take the life of his assailant, if he could do so consistently with his own safety or without

injury to his own person. The instruction in this case says nothing about being under attack, but simply stated that if the defendant, with perfect safety to himself, could have avoided killing the deceased, it was his duty to have done so. However, even if it may be true that the distinction between the instructions is metaphysical rather than substantial, and that the instruction in this case substantially states the identical doctrine declared in the instruction in the Maughs case (which doctrine is not recognized by the criminal jurisprudence of this state), still it is quite manifest that the defendant here suffered no prejudice from it. The defendant himself, as seen, did not become a witness in his own behalf, and the pertinency of the instruction, if, indeed, it had any at all to the case, arose entirely by reason of the testimony of the witnesses that testified that the deceased, on leaving the inside of the Judd tent, seized a hop pole from the ground and, with a threat, started toward the spot where Bell and Switser were standing and near and back of which one of the witnesses declared that he saw the defendant at the same time, although Bell and Switser testified that, on account of the darkness of the night, they were unable to see him. Apart from this testimony, there was no ground for the theory that the defendant, in killing the deceased, was moved by the necessities of self-preservation. But, if the defendant was responsible for the death of the deceased (and, as shown, the circumstances clearly indicate that he did the killing), there is no element of self-defense in the case. The defendant, as seen, after quarreling with Rich, left the tent in which the quarrel occurred, procured his rifle and unnecessarily returned to a point near the Judd tent, where he was, obviously, more likely to meet the deceased than if he had remained at his own camp, where, undoubtedly, he had gone from the Judd tent for the express purpose of securing the weapon with which the life of the deceased was destroyed. And, at the time of the shooting, there was no actual combat between the two men. In truth, accepting the circumstances of this case as true, the defendant, in the place of attempting to avoid further trouble with Rich after the cessation of their altercation in the Judd tent, needlessly and purposely put himself in the way of a renewal thereof, and thus it is plainly manifest that, as a matter of law, there was no ground upon which he could justly invoke the plea of self-defense.

We, therefore, conclude that, even though an instruction on self-defense might have been technically pertinent to the case (and it could have been only technically applicable, if at all), the alleged inaccuracy of the instruction here complained of in the statement of the rights of a person assaulted, when an attack is on, was innocuous under the circumstances of this case.

The next and last assignment is directed against instruction No. 16, whereby the jury were charged that the plea of self-defense is not available to a defendant who has sought a quarrel with a design to force a deadly issue and thus by his own wrongful acts create a real or apparent necessity for killing his adversary.

The instruction contains a correct abstract statement of the law, but it is claimed that there was no evidence presented or any issue of fact developed by the evidence to which it was applicable. But there is, as will be perceived from the statement of the facts herein presented, some evidence to which the instruction may be said to be pertinent. There was no error in giving the instruction and certainly no prejudice inflicted upon the defendant by giving it, even if it was not strictly applicable.

There are no other points than those which we have already considered and disposed of, and, for the reasons herein stated, the judgment and the order appealed from are affirmed.

Chipman, P. J., and Burnett, J., concurred.

A petition for a rehearing of this cause was denied by the district court of appeal on May 27, 1915, and a petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on June 21, 1915.