[Crim. No. 318. Third Appellate District.—December 14, 1915.]

THE PEOPLE, Respondent, v. G. B. DYE, Appellant.

CRIMINAL LAW — GRAND LARCENY — EMBEZZLEMENT — INSTRUCTION. — Where in a prosecution for grand larceny it is contended that if any crime was committed, it was embezzlement, and not larceny, the court correctly instructed the jury as follows: "Embezzlement is when the possession of the property has been acquired lawfully and *bona fide* and afterward fraudulently appropriated. The gist of the offense of embezzlement is breach of trust imposed in the agent, employee, or bailee, by his principal, employer, or bailor, the crime may be in general terms defined to be the fraudulent conversion of another's personal property by one to whom it has

been intrusted. When a bailee of property obtains possession of it from the owner with the intention of stealing it, and carries out that intent, he is guilty of larceny; but where the intent to steal did not exist at the time of taking possession of the property by the bailee, but was conceived afterward, it is embezzlement."

ID.—SUFFICIENCY OF EVIDENCE.—In this prosecution for grand larceny it is held that the verdict is sustained by the evidence.

ID.—EVIDENCE—STATEMENT OF DEFENDANT—DENIAL OF GUILT—FOUNDATION.—It is not necessary to show, as preliminary to the admission in evidence of a statement made by the defendant in the district attorney's office, that such statement was voluntarily made, where the statement was in no sense a confession of guilt but was in fact an assertion of innocence.

ID.—ARGUMENT OF DISTRICT ATTORNEY—PUNISHMENT—HARMLESS ERROR.—It is error for the district attorney in his argument to the jury to call their attention to the fact that the punishment for embezzlement is exactly the same as the punishment for grand larceny, but such misconduct is not prejudicially erroneous where the jury is admonished to disregard the statement.

APPEAL from a judgment of the Superior Court of Sacramento County, and from an order denying a new trial. Malcolm C. Glenn, Judge.

The facts are stated in the opinion of the court.

Ralph W. Smith, for Appellant.

U. S. Webb, Attorney-General, and J. Charles Jones, Deputy Attorney-General, for Respondent.

CHIPMAN, P. J.—Defendant was jointly with one L. S. Purdy charged with the crime of grand larceny, and upon his trial was convicted and by the judgment of the court sentenced to six years' imprisonment in the state prison at Folsom. Defendant appealed from the judgment and from the order denying his motion for a new trial. The charge was that defendant, on the —— day of January, 1915, did "willfully, unlawfully and feloniously steal, take and carry away certain personal property, to wit: One one-hundred dollar bill of currency, one twenty-dollar bill of currency and three ten-dollar bills of currency, . . . being then and there of the personal property of one S. V. Halstead and not the property of said defendant, contrary," etc.

It is earnestly contended that if any crime was committed it was embezzlement and not larceny; that defendant's motion that the court instruct the jury at the close of plaintiff's evidence to acquit defendant should have been granted because of a fatal variance between the evidence and the charge in the information. To pass upon the merit of this contention requires an examination of what occurred after Halstead went to defendant's place of business.

It appeared from the testimony of the prosecuting witness, Halstead, that he came to Sacramento from San Francisco on Sunday, January 3, 1915, and stopped at the Western Hotel on his way to Nevada City, where he resided and pursued the profession of mining engineer; he "was suffering from a severe cold and a congestion of the breast"; Monday morning, January 4th, he met a stranger at the hotel, of whom he inquired whether "he knew if there was a system of Turkish baths—a good system of Turkish baths in the city. He said yes. He says, 'I know of something that is better than the ordinary Turkish bath.' He then spoke of the Hygienic Institute at 327½ K Street or 527½. And he said, 'I have a pamphlet in my pocket describing it,' and he handed it to me and I was impressed with it, and I says, 'I believe I will go there now.' He says, 'It is very near here, on the same street,' and I immediately went over; I went to this place, called at the office and Dr. Dye was in.'' This was in the forenoon. Halstead described his condition and was examined by defendant; "he took some instruments and sounded me, and he says, 'Your chest is badly congested.' '' Halstead told him he was anxious to get to his home in Nevada City and wanted to know if he could get away that night but was told by defendant, "I wouldn't dare let you out before tomorrow night; I can get you away to-morrow night.'' Halstead asked what it would cost him, and was told that the fee would be $10, and if he would put it up he would give him the treatment at once. Halstead testified: "I had in my inside vest pocket $140 in bills. I had a five dollar gold piece in my left outside vest pocket, and I had some five or six dollars in silver in my pants' pocket. One bill was a hundred dollar bill, United States currency bill, and two twenty dollar bills. I pulled out one twenty dollar bill and handed it to him. He says: 'I will have to go down and get this changed. I will be right up.' A few minutes after he had gone, Mr.

Purdy came into the room and he says, 'You are Mr. Halstead?' I says, 'Yes.' 'Well, Mr. Halstead, we are going to give you a treatment in the bake oven.' Dr. Dye had spoken about what the process was before. He says, 'Just come in this room and undress,' and I did so, and while undressing, Dr. Dye came in. I took off everything, and either Dr. Dye or Dr. Purdy took my clothes and hung them up— Mr. Jones: Hung them up where? A. On a peg or a nail or a hook in the room where I undressed. Q. They were both present at that time? A. They were both present at that time; yes, sir. Q. Now, to go back a minute. When you took out your money and gave the twenty dollar bill to Dr. Dye, from where did you take that twenty dollar bill? A. From my inside vest pocket. Q. Did you take any other money out—any other bills—at that time? A. No. Q. Do you know of your own knowledge whether he saw the other bills in your pocket at that time? A. Not up to the time that I had taken off my clothes. I don't remember whether he looked into my clothes to see what was in there. I told him what I had—that I had— Q. (Interrupting.) You told Dr. Dye? A. Yes. Q. What did you tell him you had? A. I told him that I had $150—that was including the twenty dollars that he had taken down to get changed—and he says, 'That will be all right'; he says, 'It is here in your clothes'; he says, 'Everything will be all right, Mr. Halstead.' Q. Go ahead. A. After I took the bath, or while lying in this bath, he brought some kind of liquid—I don't know what it was— that I took through a glass tube. . . . I took it through a glass tube while lying on my back. And after I got out of the bath,—I was feeling very weak,—he assisted me into a back room of his office and put me to bed. He went out of the room, after covering me up, and came in with some liquid in a glass, and I am not sure whether it was a tablet or a capsule that he had, and he said, 'Take this.' I asked him— I remember asking him—if that was an opiate. He said, 'No.' He says, 'It is a purgative.' He says, 'I want to bring you around just as quickly as I can.' Very soon after that I went off into a sleep or a stupor. I don't remember just when I awakened; when I did, I was suffering great pain. And he brought in something else in a glass and told me to take that. Q. When you gave him the twenty dollar bill, did he give you any change? A. No. Q. What did he say about

changing it, if anything? A. He never referred to having changed it at all. Q. Well, did he leave the room to go out to change it—anything of that kind. A. Yes. When I gave him the twenty dollar bill, he went out of the room immediately. He said, 'I will go and get it changed and be right back.' Q. When he came back, was anything said about the change? A. No. Q. When you took your clothes off, they were hung up there in the closet? A. Yes, sir—not in a closet; in the room in which I undressed. Q. Did you authorize him, Purdy, or anybody else, to take the money out of your clothes and take care of it, or anything of that kind? A. No, sir. Q. Did you authorize anybody—Purdy or Dye, to take charge of your money in any way? A. Not at all. Q. You just took your clothes off with the money in and left it there? A. Yes, sir. Q. Now, what else occurred that night? A. Well, I don't remember how often he came into the room, or how often he gave me something from a glass. Once or twice I know, having rapped or called, he came in and I asked him for water—some water; I was very thirsty; and I think once he brought me in some water, and I know that the second or third time he gave me some sort of medicine from a glass. Once it was a dark color, and another time it was apparently of a clear color. Q. Did he give you any liquor? A. I don't remember whether he gave me any liquor that night or not. I think it was the next day that I was suffering, and I asked him what that was, whether it was brandy or whisky, and he says, 'It is a stimulant.' I believe, as I remember, that he said that it was brandy and peppermint. Whether there was anything else in it or not, I don't know. He said, 'I want you to take what I give you.' He says, 'I want to bring you around as quickly as I can.' Q. Well, how were you the next day? A. Well, the next night I was feeling worse than I did the night before. Q. How long were you kept there? A. From Monday morning until Friday, the following Friday night, before I got out. . . . Q. Now, when you were put to bed, what clothes did you have? A. My undershirt. Q. Were you given your clothes afterward? A. Not until the following Wednesday or Thursday. I had asked often if he wouldn't bring my clothes in. Mr. Smith: Your Honor, do I understand that you ruled that all this testimony is admissible to prove larceny? The Court: I just ruled on one question that you objected to.

Mr. Smith: I object to this character of examination. It is not any proof of larceny in any way; it is irrelevant, immaterial, and incompetent so far as the issue in this case is concerned. I ask that it be stricken out and that the prosecution be instructed not to proceed further along this line. The Court: The objection is overruled. Mr. Jones: The acts that I expect to prove will show larceny. The Court: I have overruled the objection. Mr. Jones: Go ahead, Mr. Halstead. State what you said to Dr. Dye about your clothes. A. I asked him to bring my clothes in; that I had occasion to get up out of the bed and that every time I would do so, I took a chill. I asked him the first night if he wouldn't bring my clothes into the room. I don't remember whether he said he would or not, but he did not do so; and almost every time he would come in, I would ask him to bring in my clothes. I think it was either a Wednesday or a Thursday that he just brought my pants in; no other clothes. I asked him then for the rest of my clothes, and he said that I couldn't dress anyway, and he didn't want me to go out in the condition that I was in; that I must not leave my room. It was on a Friday—rather, it was on a Thursday that I began to get suspicious that something was wrong, because he had refused to bring my clothes in to me, and I told him on a Friday, I says, 'Doctor, I want you to bring my clothes in. I am going to dress; there is no use of my staying here; I will die in here. I am going to get out of here.' And he said something like this: 'Now, don't get excited; don't get excited,' he says, 'I am going to look after you; you are all right.' I had previously asked him if my money was all right. He says, 'Yes, your money and your clothes—everything is all right. Don't feel alarmed about anything.' 'Well,' I says, 'I want you to bring my clothes in to me.' He says, 'I will,' and he went out—he went out and came back in a few minutes, and he says, 'Purdy has gone out and has the key of the room in which your clothes are located. I will have to wait until he returns. As soon as he gets back, I will bring your clothes in to you.' He went out, and probably a half an hour or longer had elapsed when I got up. I was feeling very bad and desperate. I put on my pants and I went out into the hall and went toward his office door. I took hold of the knob of the door—I believe I rapped first; then I took hold of the knob of the door and it opened. It was perhaps after 7

o'clock, because the lights, I know, in the streets were burning and the light was shining in my 'room, and the second door from his office was open. That is where I had undressed, and I went in there and I found my clothes hanging up, and my shoes and stockings were down on the floor. Q. The same room where you went to undress? A. In the same room, and the clothes were apparently just where he had hung them when I undressed. I put on my clothes—dressed—and was sitting in his office chair when he came in shortly afterward. Q. Wait a minute. You put on your clothes and 'your vest. State as to whether or no you examined them to see whether your money was there. A. I did. Q. Was your money there? A. No. Q. Was any of it there? A. Nothing at all. Q. The last time you saw the currency that you spoke about, where was it? A. In my inside vest pocket. Q. Inside vest pocket; and the gold was where? A. The gold was in my outside vest pocket. Q. And where was your coin—silver? A. In my pants' pocket. Q. Now, you looked through all those pockets, did you? A. Yes, sir. Q. And none of it was there? A. None of it was there. Q. You dressed and you went in your room? A. No; I don't remember whether I went into my room. I sat in his chair in the office. While sitting there he came in and seemed very much surprised to see me there. Q. What was said? A. 'Well,' he says, 'here you are.' I says, 'Yes, and I have found my clothes; they were not locked up. They were right where they were left when I was taken out of the room.' I says, 'Doctor, where is my money?' and he never answered. I asked him two or three times; he stood there. I says, 'Where is my money?' 'Now,' he says, 'never mind anything about that'; he says, 'Don't get excited.' He had often used that expression, 'Don't get excited.' He says, 'Now that you have got your clothes on, perhaps it is better for you to come out and get some fresh air.' 'Well,' I says, 'I want my money.' 'Well,' he says, 'you will have your money.' He says, 'Don't feel alarmed; you will have your money. Come outside and get some fresh air, and perhaps you will be able to eat something.' I went out with him and we crossed over to the Thomas Cafe, and sat down, and he says, 'Now, order anything that you want.' . . . Q. Well, where did you sleep that night? A. Back in his place; not in the room that we slept in the night before or at the time that I went there. Q. When you came out of the

Thomas Cafe—you said you had nothing in there but a glass of beer? A. That was all. Q. Now, when you came out of there, did he give you any money? A. Yes, sir. Q. How much? A. I think it was three dollars. Q. He gave you three dollars? A. Yes. Q. How came he to give you that? A. I asked him for the money and he says, 'I haven't much money with me now.' He says, 'I will get your money.' 'Well,' I says, 'I haven't any money at all; I have got nothing,' and he pulled out some money in his hand and handed me three dollars and he says, 'That will do you now,' and he says, 'I will have all your money back to you.' Q. Well, you slept in his room that night, did you? A. Yes—not in the same room that I had been sleeping in. . . . Q. What conversation, if any, did you have with him the next day in regard to your money? A. It was during the next day that he admitted that he had taken my money. Q. Well, don't say 'he admitted.' Tell just what the language was and how he came to say it, and the conversation that was had between you. A. Well, those were the words that he used. He says, 'I must admit that I have taken your money.' Those were the words he used. Q. What did he say he had done with it? A. He didn't say what he had done with it. Q. What explanation did he give, if any, for not giving it to you? A. Well, I don't remember that he gave any reason for it at all. He said that he would get it and return it to me.''

It appeared that Halstead remained there until the following Monday, when both defendant and Purdy were arrested and Halstead left the place; that defendant admitted that he had taken his money and used it; that, a week or two later and while he was under arrest, defendant paid back one hundred dollars to Halstead. On cross-examination Halstead testified that after giving defendant a twenty dollar bill the latter said he would get it changed and left Halstead for that avowed purpose, and while defendant was away Purdy took him into a room adjoining the "bake oven" and told him to disrobe, and that while doing so, or as he was about to do so, defendant returned and both defendant and Purday assisted him in disrobing. "Q. While you were disrobing you said you had valuables in your clothes? A. Either when I was disrobing or after I had disrobed and he had taken that, I told him and he said that would be all right, 'everything will be secure and safe.' Q. Was it not while you were taking

off your clothes and handed your vest to Dr. Dye? A. I don't remember at just what time during my undressing that I said that, or if it was after I had undressed. It was before I went into the bath. . . . I was impressed that the place was reputable and genuine and Dr. Dye impressed me very much, and I hadn't the least doubt in the world but that everything was all right and safe and no question occurred to me at all. Q. The question of a breach of trust had never occurred to you? A. No. Q. You went there and, you might say, trusted your life and what you. had to Dr. Dye? A. Yes, sir. Q. And you trusted what you had to him? A. Yes. Q. You did not see him put your clothes in a locker of any kind, did you, or trunk or anything? A. No. Q. They were just hung on a nail? A. Hung on a nail or hook, yes. I think in the corner between the doors of the two rooms. Q. Your vest with the valuables was hung with the other clothes? A. I believe they were at the time all hung together.'' He testified that he expected to be in the room there until the next day and that no room was designated for him to occupy after leaving the bath. ''Q. After you had taken your bath, you did not expect to return to this room? A. Well, I hadn't thought anything about it at all where I would be placed.'' He testified that defendant did not give him the change but kept the twenty dollar bill. ''Q. Did you not say you had trusted everything to his hands? A. I may have. I naturally would do so, because I think I remember his asking me if I had any doubts about anything being not right. I told him I had no reason for any doubt at all. Q. You trusted everything to him? A. I had confidence in the place and in him, or I would not submit to the treatment or trust him with what I had. Q. And you did trust your clothing and your money and your person to Dr. Dye? A. Yes.'' He testified that, ''with the exception of his pants,'' he did not see his clothes from Monday until Friday. ''Q. You turned your clothing and your money over to the care and custody of the defendant? A. Why, certainly. Q. And trusted implicitly in him? A. That my money would be there when I would come out, of course. Q. You gave him possession of your money and your clothing? A. I gave him possession of my clothing with money in it, and told him that my money was in my clothing, and he said it would be all right; it would be there when I came out.

Q. And you expected him to look after your money and your clothing, did you not, Mr. Halstead? A. Why, certainly. Q. And keep it safely for you? A. Why, I expected just the same as any clothes. I couldn't think of anything else."

On re-examination in chief he testified: "Q. Now, you took your vest off and you simply handed your vest to one of these gentlemen to hang up, or hung it up yourself? A. I didn't hang it up myself. Q. You handed it to one of them? A. Yes, sir. Q. You left it there as you would if you had taken off your clothes and was going to take a bath? A. Yes, sir. Q. There was nothing said at that time about them taking care of your money as distinct from your clothes? A. No, no. Q. You simply left your clothes there as you would anywhere when you disrobed? A. Yes, sir. Q. You are sure you did not take out the money and hand it to him and put it specially in his charge or anything of that kind? A. No, I did not. Q. You went and took your bath? A. Yes, sir. Q. You frequently asked him for your clothes? A. Yes. Q. And he put you off? A. Yes."

The district attorney dismissed the information as to Purdy and called him as a witness. He testified that he assisted Dye in disrobing Halstead and in giving him the bath. He testified that he hung up part of Halstead's clothes and Dye "hung the rest of them," and that he, Purdy, put the patient in the bake oven. "Q. Was anything said at the time in regard to any money? A. Not to my knowledge"; that the first he heard of any money was the following Friday, when he met Dye in the office. "I asked him if he had this man's money and if he had it, he better pay it back, that he would only get us in trouble. . . . Q. What did he say? A. He said that he had that all fixed up. He said everything was all right." He further testified that he saw Dye have a hundred dollar bill on Tuesday and asked him where he got it and that Dye pointed in the direction of the treatment room.

Gertrude Walker, who kept the rooming-house where defendant had his institute, testified that defendant showed her a hundred dollar bill on Tuesday or Wednesday following the day Halstead came to the place. It is not necessary to state the evidence further as to defendant's having Halstead's money. He admitted it to attorney Crowley, who was Halstead's attorney, but claimed that Halstead loaned it to him,

which the latter testified was untrue.   The question urged is that the evidence failed to establish larceny.

The court correctly instructed the jury as follows: ''Embezzlement is when the possession of the property has been acquired lawfully and *bona fide* and afterward fraudulently appropriated.   The gist of the offense of embezzlement is the breach of trust reposed in the agent, employee, or bailee, by his principal, employer or bailor, the crime may be in general terms defined to be the fraudulent conversion of another's personal property by one to whom it has been intrusted. When a bailee of property obtains possession of it from the owner with the intention of stealing it, and carries out that intent, he is guilty of larceny; but where the intent to steal did not exist at the time of taking possession of the property by the bailee, but was conceived afterward, it is embezzlement.''

''In the case of grand larceny, the taking must be with a felonious intent, as heretofore stated, but in embezzlement, the original taking is lawful, and the crime consists in the fraudulent appropriation of property by a person to whom it has been intrusted.''

We are of the opinion that at the time Halstead disrobed for his bath and his clothing was ''hung up on pegs or hooks'' in the dressing-room adjoining the so-called bake oven the possession was not taken by defendant, nor in the sense of being intrusted to him by Halstead did he become a bailee. In fact, the clothing seems not to have been removed except that the trousers were late in the week brought to Halstead, and he found his coat and vest where they had been placed when he entered the room to take his bath.   Defendant was told at the time Halstead was undressing that his money was in his clothing, and defendant's subsequent conduct justified the jury in inferring that he formed the intent to take that money and appropriate it to his own use—in short, to steal it—when he was helping to undress Halstead.   But if this intent was formed the next day (and there was evidence that he had the money on Tuesday), the felonious taking would constitute larceny, for the reason that Halstead's property had not been placed in his custody and keeping.   Halstead testified that he did not authorize Purdy or Dye to take charge of his money; that ''he just took off his clothes with the money in and left it there.''   He was not told how long he would

have to remain in the bath or when he was to be taken from there. (*People* v. *Montarial,* 120 Cal. 691, [53 Pac. 355].) He testified that he had no reason to distrust defendant and that he trusted everything to him. Naturally he so felt or, as he testified, he "would not have been there." We do not think that these expressions of confidence in defendant must necessarily be construed as having clothed defendant with the authority of a bailee, in the sense that he could not be held guilty of larceny for having feloniously taken and appropriated his patient's money.

It is urged that the court erred in admitting the statement of the defendant taken in the district attorney's office by the chief deputy, Mr. Jones, and his stenographer. On January 11th, one week after Halstead went to these baths, defendant was arrested and taken first to his own office and then to the office of the chief of police, and thence to the district attorney's office. When arrested he was told that "it is relative to a fellow from Nevada. Probably you know about it." This occurred on the street where he was arrested. Nothing further was said until he was taken to his office. "When he got up to the office he stated, 'I haven't any of this man's money. What are they trying to rib up on me now? Some more ribbing?' He says, 'All I had of this man's money was twenty dollars.' He says, 'I don't know anything about his money.' It was along those lines. Q. He said that voluntarily before you had said anything to him? A. Yes, sir. Q. You did not tell him before that that any statement that he made would be used against him? A. He was pacing up and down in the room and he seemed to be excited and very nervous, and he was talking at random, there in the room before us. Q. Well, you did not tell him or you did not advise him of any rights, did you, before that—before making that statement? A. I hadn't asked him anything relative to it. Q. Just volunteered this statement? A. Yes." Defendant moved that this testimony be stricken out, because he was not advised of his rights. The motion was denied. Defendant was then taken to the district attorney's office, where he made a statement which was taken down by the court stenographer and was offered and admitted in evidence. Defendant objected that "he was not advised of his rights prior to the making of the statement," or "that it would be used against him on the trial, he was not properly informed." The prelimi-

nary questions were as follows: "By Mr. Jones: Dr. Dye, this is the district attorney's office. A. Yes, sir. Q. This is Mr. Carragher, the deputy district attorney. A. Yes, sir. Q. And my name is Jones; I am chief deputy district attorney. A. Yes, sir. Q. This is Mr. Warren Doan, the shorthand reporter, and you know the officer. A. Yes, sir; I have had a sad experience with the officer. Q. We brought you here to have a talk with you. A. Yes, sir. Q. I do not want you to feel that you are under any restraint or that there are any threats made against you or any promises made to you. A. Yes, sir. Q. There is a serious charge made against you, and we want to hear your statement if you have any to make. A. Well, what was the charge? Q. The charge is that you took a hundred and fifty dollars or thereabouts from a man by the name of Halstead." Then follows the statement. Defendant stated the history of Halstead's coming to his place of business, his experiences while there, and his departure from the place. It is not necessary to set out this statement. In the main it disputes Halstead's story; is a justification for what was done in treating him; denies that Halstead had the money he claims he had, and states that all the money he, defendant, got was the twenty dollar bill and a one dollar bill. The statement was in no sense a confession of guilt but was in fact an assertion of innocence.

Section 1324, Penal Code, has no application. (*People* v. *Panagoit*, 25 Cal. App. 158, [143 Pac. 70].) So far as the record shows, defendant made no objection to giving his connection with the transaction. There was, in our opinion, no violation of his constitutional rights in reading the statement to the jury. In *People* v. *O'Bryan*, 165 Cal. 55, [130 Pac. 1042], relied upon by defendant, O'Bryan was arrested on suspicion and was held in custody in the county jail. "He was taken before the grand jury which was investigating the offense, and sworn to testify. He was not informed of his constitutional right to decline to be a witness against himself, nor was he warned that his statements might be used against him." In that case the court said: "The constitution protects a person from being *compelled* to be a witness *against himself*. If, at the time he appears no accusation, formal or informal, has been made against him, he does not, in testifying, become a witness against himself. Or if, even though charged with crime, he voluntarily gives evidence

against himself, his rights are not infringed by the use of such evidence thereafter. These distinctions are well illustrated by a series of New York cases'' (citing the cases). In the case here defendant did not testify; he made certain extrajudicial statements and, under the circumstances disclosed, we think they were voluntarily made. But if there was error in admitting the statement, we are satisfied from an examination of the entire record that the result was just and would have been reached if the error had not been committed. (Const., art. VI, sec. 4½; *People* v. *O'Bryan*, 165 Cal. 55, [130 Pac. 1042].)

Error is assigned because of alleged misconduct of the deputy district attorney. In addressing the jury he said: ''Gentlemen of the jury, let me call your attention to one thing; the punishment for embezzlement is exactly the same as the punishment for grand larceny. Mr. Smith: We object to that statement, if your Honor please, and ask that the jury be instructed not to consider it. The Court: Yes, the jury cannot consider that. Gentlemen of the jury, you will not consider that statement of the district attorney.'' The district attorney overstepped the boundary of his privilege in addressing the jury, for the question of punishment was of no concern to them, and, as the principal defense was that there was a fatal variance between the proofs and the charge, the statement, unchallenged, might have had some influence to defendant's prejudice. We must assume, however, that the jury obeyed the direction of the court and did not consider the statement.

The judgment and order are affirmed.

HART, J., Concurring.—I concur in the judgment and in all that is said by the presiding justice concerning the effect of the evidence and the justification of the verdict of conviction under the proofs. But I do not think it is necessary to invoke article VI, section 4½, of the constitution, to uphold the court's ruling in admitting in evidence the extrajudicial statement of the defendant when in the office of the district attorney. The application of said section of the constitution in a case presupposes either error in the ruling as to which it is invoked or a doubt in the mind of the reviewing court as to the correctness of the ruling.

In the first place, the statement of the defendant in the district attorney's office is not a confession. On the contrary, it involved an explicit and direct denial of guilt of the crime charged or of any crime in connection with the defendant's transaction with the prosecuting witness. It was, therefore, unnecessary to show, preliminarily to the admission of the statement, that it was voluntarily made or not made under the inducement of hope or fear. (Greenleaf on Evidence, sec. 213.)

In the second place, I am clearly of the opinion that, had the defendant confessed that he committed the crime of larceny against the prosecuting witness under the circumstances characterizing the making of the statement which was allowed to go to the jury over his objection, we would be required to hold that it was voluntarily made. Before being questioned as to his connection with the alleged crime, the defendant was informed by the deputy district attorney that he was then in the presence of the officers of the law, including an officer who would probably have something to do with the presentation of the case against him at the trial. He was further sufficiently given to understand that he was not compelled to make a statement or "under any restraint or that there are any threats made against you or any promises made to you." This warning, I think, was sufficient to apprise the defendant of his right not to make a statement if he so elected, and that he would be shown no favor if he did make one. Of course, a confession, to be admissible as proof of guilt, must not have been "extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exercise of any improper influence." (3 Russell on Crimes, 6th ed., 478.) But, as our supreme court declared, in the case of the *People* v. *Siemsen,* 153 Cal. 387, 394, [95 Pac. 863], "whether a confession is free and voluntary is a preliminary question addressed to the trial court and to be determined by it, and a considerable measure of discretion must be allowed that court in determining it." (See, also, *People* v. *Miller,* 135 Cal. 69, [67 Pac. 12]; *Hopt* v. *Utah,* 110 U. S. 574, [28 L. Ed. 262, 4 Sup. Ct. Rep. 202]; *People* v. *Burns,* 27 Cal. App. 227, [149 Pac. 605].) Obviously, there must be some showing that the confession was freely and voluntarily made and without any previous inducement or offer of leniency in punishment, or by reason of any

intimidation or threat. (*People* v. *Miller*, 135 Cal. 69, [67 Pac. 12].) And that there was such a showing in this case, I am, as before suggested, thoroughly persuaded.

As I understand the object of section 4½ of article VI of the constitution, it is to be applied only where manifest error has been committed, and a review of the whole record, including the evidence, does not justify the conclusion that a miscarriage of justice will be the inevitable result of such error, if the judgment should be affirmed.

Burnett, J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on February 10, 1916.