[Crim. No. 366.    Third Appellate District.—May 9, 1917.]

# THE PEOPLE, Respondent, v. RICHARD W. FEALY, Appellant.

CRIMINAL LAW—INDICTMENT—SUFFICIENCY OF EVIDENCE—QUESTION NOT REVIEWABLE.—While it is true that section 919 of the Penal Code provides that the grand jury can receive none but legal evidence, and the best evidence in degree, to the exclusion of hearsay or secondary evidence, and while it is also true that section 921 declares that such body ought to find an indictment when all the evidence before them, taken together, if unexplained or uncontradicted, would, in their judgment, warrant a conviction, yet, there is no method provided for revising the action of the grand jury in finding an indictment on the ground that there was not sufficient evidence to support it.

ID.—BURNING OF INSURED BUILDING—CONSPIRACY—EVIDENCE—STATEMENTS AND TRANSACTIONS OF CONFEDERATES.—Where, in a prosecution for the crime of burning an insured building with intent to defraud the insurance company, the theory of the people at the trial was that the burning was the climax of a conspiracy concocted by the defendant, his wife, other members of his family and a third party, it is proper to admit conversations and transactions of the alleged conspirators relative to the conspiracy after its formation and before the consummation of its object, regardless of whether the defendant was present when they occurred.

ID.—DEFENDANT AS A WITNESS—IMPEACHMENT OF CHARACTER.—Where a defendant in a criminal case testifies in his own behalf, he for the time being removes from himself the character of a defendant, and takes on that of a witness, and his character as a witness for truth, honesty, and integrity may be impeached like that of any other witness.

ID.—CONSIDERATION OF TESTIMONY OF DEFENDANT—EVIDENCE—HARMLESS ERROR.—An instruction that the jury should fairly and impartially consider the testimony of the defendant, and if it produced conviction, they should act upon it, otherwise they might reject it, is not prejudicially erroneous, where the evidence of the defendant's guilt is clear and convincing.

ID.—CIRCUMSTANTIAL EVIDENCE — INSTRUCTION.—An instruction that circumstantial evidence may consist of incriminatory admissions made by one accused of crime, plans laid for the commission of the crime by the accused, such as putting himself in a position to commit it—in short, any act, declaration, or circumstance admitted in evidence tending to connect the accused with the commission of the crime—is not an instruction on matters of fact.

APPEAL from a judgment of the Superior Court of Napa County, and from an order denying a new trial. Henry C. Gesford, Judge.

The facts are stated in the opinion of the court.

E. S. Bell, Charles J. Heggerty, and Knight & Heggerty, for Appellant.

U. S. Webb, Attorney-General, and J. Charles Jones, Deputy Attorney-General, for Respondent.

HART, J.—The defendant was indicted by the grand jury of Napa County for the crime of "willfully and feloniously burning, injuring, and destroying property with the felonious intent to injure, prejudice, damage, and defraud the insurer" of said property. Thereafter he was put upon his trial thereunder, and was convicted by the jury of the crime as so charged, and he appeals from the judgment of conviction and the order denying him a new trial.

The law upon which the indictment was founded is to be found in section 548 of the Penal Code, whose language is as follows:

"Every person who willfully burns, or in any other manner injures or destroys any property which is at the time insured against loss or damage by fire or by any other casualty, with intent to defraud or prejudice the insurer, whether the same be the property of or in possession of such person or of any other, is punishable by imprisonment in the state prison not less than one nor more than ten years."

Following what is conceived to be the more orderly course in this case, the story of the alleged crime, as it was developed by the evidence, should first briefly be narrated.

It should first be explained that the theory of the people at the trial and in the prosecution of the defendant was that the burning of the building was the climax of a conspiracy concocted by Fealy, his wife, other members of his family, and one Will Dodson, and that the motive for the act was to secure the insurance which had been placed upon the building and its contents.

The crime charged was committed on the twenty-third day of September, 1913, at about 8 o'clock in the evening. The property alleged to have been set on fire and burned by the

accused was a dwelling-house, situated at the corner of Hudson Avenue and Main Street, in the city of St. Helena, Napa County.  This property was originally owned by Mrs. Mary Center, the mother of Mrs. Laura Ida Fealy, wife of the defendant.  Mrs. Laura Ida Fealy at the time of her intermarriage with the defendant, on the twelfth day of June, 1910, was a widow, having previously been the wife of one Gisin, by whom she had two male children, Ernest and George, aged, respectively, at the time of the trial, about twenty-two and twenty-four years.

Mrs. Center conveyed the property in question to her daughter, Mrs. Fealy, on the first day of November, 1910. This conveyance was a deed of gift, the expressed consideration being love and affection.  On the eighteenth day of July, 1913, Mrs. Fealy conveyed said property, by a deed of grant, bargain, and sale, for the nominal consideration of ten dollars, as expressed in said deed, to said Will Dodson, a resident of the city and county of San Francisco.  On the eleventh day of November, 1915, said Dodson reconveyed the property to Mrs. Fealy.

The facts above recited concerning the several transfers of the property prior to the burning of the building and the retransfer of said property by Dodson to Mrs. Fealy after the burning are, as may readily be apprehended, established by record evidence, as to the verity of which no question is raised. Further facts of the case, a brief statement of which, following an orderly course, is to follow, are reasonably deducible from the evidence as presented, and show quite conclusively that the verdict is well supported, although, it is to be remarked, there is evidence in the record which, if believable, would support a conclusion the reverse of that evidenced by the verdict.

For several years prior to and at the time of the fire, on the twenty-third day of September, 1913, the defendant and his wife, together with the latter's mother, Mrs. Center, and two sons, Ernest and George Gisin, resided in the house in question.  Upon the said property there then subsisted an encumbrance amounting to a trifle over four thousand dollars.  On various occasions the members of the family above referred to discussed their financial affairs, and it was finally suggested by the defendant that the better way to relieve themselves of their financial obligations and burdens would be to burn the property, secure the insurance, and with the money so ob-

tained pay off their indebtedness and, with the balance of the money, set themselves up in the ranching business. This proposition was frequently discussed among the members of the family, and on several occasions when Thomas Fealy, a brother of the defendant, was present. As a part of the scheme thus proposed, the property was, as above shown, transferred by Mrs. Fealy to Dodson. The insurance on the house at the date of this transfer stood in the name of Mrs. Center, the mother of Mrs. Fealy. Upon the conveyance of the property to Dodson, the latter, accompanied by Mrs. Fealy, went to the local agent in St. Helena of the companies issuing the policies of insurance on the property, and had the insurance transferred to Dodson, Mrs. Fealy at the same time explaining that she had transferred the property to Dodson. On this same occasion Dodson applied for and received additional insurance of one thousand five hundred dollars on the contents of the house, that is, the furniture and other household equipments. As the property then stood, the aggregate insurance on the house and its contents amounted to the sum of nine thousand dollars, of which the sum of six thousand dollars was on the house and the balance, three thousand dollars, on the furniture and other contents. There is evidence tending to show, and which, in fact, if believable, does show, that the house, which was a frame two-story building and, with the exception of a small addition built to it in recent years, an old structure, was of no greater value than of the sum of three thousand five hundred dollars. It is not seriously claimed that the furniture and other contents of the building were not of the value of the sum for which they were insured, viz., three thousand dollars.

After the last-mentioned transaction was consummated, the defendant and his brother proceeded to remove the furniture and other household paraphernalia from the building to the home of the defendant's father, Thomas F. Fealy, Sr., near Rutherford, Napa County, and distant about six miles, northeasterly, from the Hudson Street property, or the property that was burned. The bulk and the most valuable of the furniture, carpets, silverware, kitchen utensils, and dining-room equipments were by degrees or at near intervals so taken to the senior Fealy's home and there stored. The defendant then placed in the burned house a quantity of old furniture,

which was of very little value, and scattered it about the house in the several rooms in irregular order.

The building was only partly damaged, the fire having been observed and an alarm thereof given in time to enable the fire department and citizens of the town to get to the building before the fire had made much progress or gained any considerable headway. After the flames were extinguished an examination of the interior of the house very plainly disclosed that some four or five fires, originating in different rooms and parts of the building and independently of each other, had started. One of these fires was started in the attic of the building. It was further discovered that large-sized holes had been punched into the walls of some of the rooms, the plastering and lathing having thus been broken in at a number of different places. Into these holes there had been placed or stuffed a large quantity of old newspapers, excelsior, evidently taken from an old, dilapidated lounge found in one of the rooms, and other like inflammable materials.

The house was lighted by electricity furnished by a local power company. There were two or three kerosene oil lamps in the house, but these were used only when the lighting system was temporarily out of repair or in defective condition for brief periods, as from heavy rain or wind storms. It was shown by an expert electrician who was thoroughly familiar with the electric wiring of the house, and who minutely examined the wires and their connections immediately after the fires in the house had been extinguished, that it was absolutely certain that the fires were not caused, either directly or indirectly, by the electrical currents transmitted to and through the wires or from electricity at all.

That a large quantity of the most valuable contents of the house upon which insurance had been placed was removed therefrom at different times by the defendant prior to the fire seems to have been very clearly shown. The Gisin brothers, or at least one of them, testified to seeing the defendant take the furniture from the house, load it into a wagon, and haul it away, and that they subsequently saw it at the home of the elder Fealy. The boys were corroborated by other witnesses, who saw the wagon loaded with furniture leaving the Hudson Street house, and by the statement of the defendant himself to one of said witnesses that, Dodson having bought the house and realty, he (defendant) was moving

33 Cal. App.—39

the furniture away to be stored until such time as he could settle upon a farm which he intended quite soon to take over. In fact, the circumstance of the removal of the furniture from the Hudson Street house to the home of the defendant's father seems to have been quite conclusively shown by the production in court at the trial of the furniture, etc., itself, it having been further shown in this connection that the officers of the law had, under the authority of a search-warrant, found the furniture and taken possession thereof at the home of the elder Fealy.

The Gisin brothers, who claimed to have known, from its very inception, of the scheme to destroy the Hudson Street property by fire, after the removal of the contents of the building therefrom, but who declared that they were forced to secrecy concerning said scheme by threats of the defendant that, if he went to jail for the crime, they (the Gisin boys) would go with him, gave exceedingly damaging testimony against the accused. From the testimony of the one or the other or both, these facts were elicited: That at some time prior to the fire, one of the streets upon which the building abutted was plowed and torn up, preparatory to the bituminizing thereof, and that, while the street was in that condition, the defendant remarked to one of the boys that "this would be a good time for the fire, as the fire-engine could not get down near the house and put the fire out"; that, just preceding the date of the fire, the water connection of the premises with the city water-mains was disconnected by the defendant, and this for the avowed purpose of circumventing any efforts which might be found requisite properly to combat and extinguish the fire; that, on the night of the fire, the large water-tank maintained on the premises was dry or without even a trace of water therein; that several days before the fire, the defendant was in one of the rooms of the house, engaged in experimenting with burning candles to determine, as he declared to one of the Gisins, how long it would require a lighted candle five inches in length to consume itself or burn to the end; that he said that he intended to use the candles for the purpose of setting fire to the house, by placing them in the holes in the wall into which paper and other readily combustible material had been placed, and in such a position with reference to said material that the candles, being lighted, would in a brief time burn

down to the material and thus set it afire; that, on the evening of the fire, having, according to other witnesses, left the Hudson Street house in a buggy, accompanied by his wife, at about 6 o'clock, the defendant two hours later arrived at the "Farrier place," in Conn Valley, Napa County, where the Gisin boys, Mrs. Center, and a brother of the latter were then temporarily domiciled in an "old shack," as one of the Gisins described the structure; that he told the boys that it was then about time that the house should "go up," and that if they would go up "on the hill" they could probably see the blaze from that point; that the defendant's wife commenced to cry and said, "Yes, he set the house on fire"; that the defendant remained at the Farrier place for a brief time and then went away.

It was shown that, near the hour of 10 o'clock that night, the defendant appeared at the Hudson Street house while many of the people that had been attracted to the place by the fire were still there. He had left his wife in the buggy, and himself went into the house, where he met a man named Beck. He asked the latter: "What is the matter—is there a fire?" Beck replied: "Well, you s——n of a b——h, can't you see that the house is on fire?" to which the defendant made no reply, but afterward inquired whether the piano had been saved. Having been told that it was not, he immediately left the house without going into any other room than the living-room, where the above conversation took place.

Some weeks after the fire, Dodson filed with the insurance companies a sworn statement of the loss, and included in said statement was a detailed list of the furniture, pictures, silverware, and other contents of the house, upon which an insurance of three thousand dollars had been placed and which, previously to the fire, had been removed from the house as above indicated and described. The companies carrying the insurance on the house and the contents refused to pay the policies, and thereupon suits were instituted in the superior court for the recovery of the insurance money.

There is a vast amount of other testimony in the record than that from which the foregoing facts are extracted. In fact, the testimony covered a wide range of topics, all bearing in a greater or less degree upon the charge set forth in the indictment, and disclosing and establishing against the accused circumstances of the most incriminatory character,

including statements by the defendant which involved, in effect, admissions of the incendiary origin of the fire and his responsibility therefor. We have, however, briefly stated herein enough of the testimony presented before the jury in support of the charge preferred against the defendant clearly to show that the verdict stands before this court amply supported.

It is not seriously urged here, though, that the conclusion arrived at by the jury as indicated by the verdict is not sustained by the proofs. It is claimed, however, that the defendant was denied a legal trial for these reasons, generally stating them: (1) That a large amount of the evidence presented before the grand jury, and upon which the indictment was founded, was irrelevant and incompetent, and that there was not sufficient competent proof adduced before that body to warrant the finding of the indictment; that therefore the trial court erred in denying the motion of the accused to set aside the indictment; (2) that the court erred in admitting certain testimony to which objection was made by the accused; (3) that the charge of the court involved an erroneous and prejudicial statement of the law in certain indicated particulars. These propositions will now be considered in the order in which they are thus stated.

1. We are not prepared to say that the testimony taken before the grand jury was not of a character to warrant the indictment of the accused. It is true that the investigation before that body was not as full and complete as was the trial, and that many facts and circumstances brought out at the trial were not developed before the grand jury; still, the fact of the removal by the defendant of the furniture, etc., from the house shortly before the fire, the fact that certain oil paintings which had been hung from the walls of the house before the fire and some furniture were found stored in the "tank-house" after the fire, the fact that holes had been bored in the walls and paper and other inflammable materials stuffed in said holes, the fact that several fires, evidently starting independently of each other, broke out in the house and in different rooms, and the fact of the securing of additional insurance on the furniture, etc., which was removed from the house, were all brought to the attention of the inquisitorial body. In addition to these facts, the actions of the defendant and his wife prior to and on the day and

evening of the fire were shown, thus disclosing conduct on their part which, when considered in connection with the circumstance of the burning of the house, was, to say the least of it, of a very suspicious character.

But conceding, for the purpose only of the decision of the point now before us, that the testimony so heard was entirely incompetent and in any event entirely insufficient to justify the indictment, yet, under the law, an appellate court cannot review that question to any purpose. It is true that section 919 of the Penal Code provides that the grand jury can receive none but legal evidence, and the best evidence in degree, to the exclusion of hearsay or secondary evidence. It is also true that section 921 of said Code declares that "the grand jury ought to find an indictment when all the evidence before them, taken together, if unexplained or uncontradicted, would, in their judgment, warrant a conviction," which, no doubt, also means that, unless the evidence is such as is thus described, an indictment ought not to be returned, although it has been held that as far as said section was intended to go was to operate "only as a matter of advice to the jury." (*State* v. *Boyd,* 2 Hill (S. C.), 288, [27 Am. Dec. 376] ; *In re Kennedy,* 144 Cal. 634, [103 Am. St. Rep. 117, 1 Ann. Cas. 840, 67 L. R. A. 406, 78 Pac. 34].) It ·has, however, repeatedly been held in this state that there is no method provided for revising the action of a grand jury on the ground that there was not sufficient evidence to support it. (*In re Kennedy,* 144 Cal. 636, [103 Am. St. Rep. 117, 1 Ann. Cas. 840, 67 L. R. A. 406, 78 Pac. 34]), and cases therein cited; *Brobeck* v. *Superior Court,* 152 Cal. 289, [92 Pac. 646]. See, also, Bishop on Criminal Procedure, sec. 872, and *United States* v. *Reed,* 2 Blatchf. 437, [Fed. Cas. No. 16,134].) In the Kennedy case it is said : "An indictment is the record of the action of a judicial body, and such action is final when there is no appeal therefrom and no other method provided for revising it; and there is no method for revising it on the ground that there was not sufficient evidence to support it" (citing Bishop on Criminal Procedure, sec. 872; *State* v. *Boyd,* 2 Hill (S. C.), 288, [27 Am. Dec. 376] ; *Smith* v. *State,* 61 Miss. 759; *Hight* v. *United States,* Morris (Iowa), 407, [43 Am. Dec. 111] ; *United States* v. *Reed,* 2 Blatchf. 437, [Fed. Cas. No. 16,134] ; *Hammond* v. *State,* 74 Miss. 214, [21 South. 149]).

In all the cases just named, the question was reviewed on appeal, and in the Kennedy case, *supra,* our supreme court said that: "The statutes of the states where the decisions above referred to were made do not differ materially on the subject of grand juries . . . from those of this state."

2. Counsel for the defendant, in their briefs, make a general objection that a mass of evidence was admitted which involved irrelevant and hearsay testimony, all prejudicial to the substantial rights of the accused. The fact is, indeed, that the alleged errors of which the defendant thus seeks to avail himself here are not pointed out with that definiteness essential to make it entirely clear what particular rulings it is claimed the court erroneously made to the detriment of the accused. But we are able to gather from the briefs that it is the claim that all the testimony relating to the several transfers of the property, when those transactions were not carried on or discussed in the presence of the defendant, was hearsay and incompetent; that the testimony relative to the insurance, involving the statements and acts of Dodson, Mrs. Fealy, and the insurance agents and adjusters, made and done both before and after the fire, in the absence of the defendant, was likewise incompetent and prejudicial; that the testimony of the notary public, before whom the deed from Mrs. Fealy to Dodson was acknowledged, disclosing what was done and said by and between Dodson and Mrs. Fealy constituted hearsay statements, the defendant not having been present when that transaction took place; that certain witnesses were erroneously permitted to testify that certain furniture which was found to have been removed from the house before the fire they had seen in the house prior to the fire; that the testimony offered and received in impeachment of the defendant's general reputation in Napa County for truth, honesty, and integrity was improperly allowed and seriously damaging to the defendant. As before stated, the theory upon which the case was tried was that the defendant, his wife, his brother Tom, and Dodson had entered into a confederation or conspiracy to destroy the building by fire for the purpose of securing the insurance money. Necessarily, from the very nature of the case—that is, from the fact that, to support the charge and prove the defendant's connection with the alleged conspiracy, reliance upon circumstantial evidence was necessary—the proofs covered an

extensive and varied field of inquiry. The evidence in the case of a conspiracy, where the defendant's connection therewith it is necessary to prove, is wider than perhaps in any other case. Taken by themselves, the acts constituting a conspiracy, while perhaps more or less incriminatory, are seldom of an unequivocally guilty character, and can only be properly and justly estimated when connected with all the surrounding circumstances. And there is no rule of evidence better settled than that: "Where the guilt of a party depends upon the intent, purpose, or design with which an act is done, or upon his guilty knowledge thereof, collateral facts in which he bore a principal part may be examined into for the purpose of establishing such guilty intent, design, purpose, or knowledge. It is sufficient that such collateral facts have some connection with each other as a part of the same plan or induced by the same motive, and it is immaterial that they show the commission of other crimes." (8 Cyc. 684.)

In this case, the theory that there had been formed by and between the defendant, his wife and brother and Dodson a conspiracy to destroy the building by fire is an exceedingly plausible one. It, indeed, was supported by what appear to be very powerful circumstances; and, while it is no doubt true, as might reasonably be expected and, indeed, quite unavoidable in a case where, as in this, multitudinous as well as multifarious circumstances are required to be shown to prove the ultimate fact, some erroneous statements or testimony found their way here and there in the record, still careful examination and consideration of all the testimony has convinced us that, in the main, the testimony complained of was not only pertinent to the case but legally competent, and that the few errors which were committed were of little consequence, or bore upon matters which, in view of the strong circumstantial case legitimately made against the defendant, could have exerted no baleful influence in bringing about the result arrived at by the jury.

Replying, however, somewhat specifically, though briefly, to the objections urged here against some of the testimony, it may be observed that it was obviously not only proper, but, considering the hypothesis upon which the case was presented by the people (that the burning was the consequence of a conspiracy formed for that purpose), it was necessary to show that the property in reality belonged to Mrs. Fealy, and

that she had never in fact parted with title thereto before the fire, and the conveyance to Dodson, as he himself admitted, was not intended nor understood to be a *bona fide* transfer of the fee; that it was likewise proper and necessary to show that the insurance had been transferred to Dodson; that he obtained additional insurance on the furniture or building; that he, aided by the defendant and his wife, made out the inventory of losses to present to the insurance companies, and included therein furniture, silverware, pictures, and other household equipments which had, prior to the fire, been removed by the defendant and his wife from the house and stored and safely preserved elsewhere. It was proper to show that the insurance companies refused to pay the losses, when such payment had been applied for by Dodson and Mrs. Fealy, even though some of the conversations relating thereto were had when the defendant was not present. All these conversations and transactions were had before the consummation of the transaction for the execution of which the conspiracy or corrupt agreement was formed, viz., fraudulently to obtain money from the insurance companies holding policies on the property. They therefore involved statements only of certain of the alleged conspirators relative to the conspiracy after its formation and before the consummation or abandonment of its object, thus rendering testimony thereof, whether the accused was or was not present when they occurred, admissible under the rule. (Code Civ. Proc., sec. 1870, subd. 6; 8 Cyc. 680, and cases cited in the footnotes; *People* v. *Irwin,* 77 Cal. 494, [20 Pac. 56].)

The proposition that the testimony of the general reputation of the defendant in the community in which he had resided for many years for truth, honesty, and integrity was erroneously allowed is to be met by reference to the provisions of section 2051 of the Code of Civil Procedure. That section declares that a witness may be impeached, among other ways, "by evidence that his general reputation for truth, honesty, or integrity is bad." The defendant took the witness-stand in his own behalf, and gave testimony the purpose and the tendency of which were to exculpate him from the charge or absolve him entirely from any connection with the commission of the alleged crime. It has from a very early date and time and again been held that, when a defendant in a criminal case testifies for himself and gives testimony tend-

ing to exonerate him from the crime for which he is on trial, he for the time being removes from himself the character of a defendant and takes on that of a witness, and that the moment he so submits himself as a witness, ''his character *as such witness*, for truth, honesty, and integrity is involved,'' and he becomes subject to the same rules for testing his credibility before the jury, by impeachment, as is any other witness. (*People* v. *Beck*, 58 Cal. 212; *People* v. *Bentley*, 77 Cal. 7, [11 Am. St. Rep. 225, 18 Pac. 799]; *People* v. *Gallagher*, 100 Cal. 466, [35 Pac. 80]; *People* v. *Hickman*, 113 Cal. 80, 86, 87, [45 Pac. 175]; *People* v. *Mayes*, 113 Cal. 618, 624, [45 Pac. 860].) It follows that it was proper in this case for the people, by way of rebuttal, to show that the defendant's general reputation for the traits mentioned was bad.

The defendant complains of the following instruction which was given by the court: ''The defendant has offered himself as a witness in this case, and given testimony in his own behalf, which is his constitutional right, and you should not reject his testimony solely because he stands accused of a crime. It is your duty to fairly and impartially consider his testimony under the rules of evidence given you, and *if it produces conviction in your minds, you should act upon it, otherwise you may reject it.*''

The criticism is aimed at the portion of the instruction in italics, and it is said that by that language the court in effect instructed the jury that it was incumbent upon the defendant to establish his innocence beyond a reasonable doubt.

It may perhaps be well enough in criminal cases to remind the jury of their duty of considering and weighing the testimony of a defendant as they are required to consider the testimony of any other witness in the case, and regardless of the fact that the defendant stands accused of the crime which is under investigation; but the other parts of the instruction it is unnecessary under any view to submit to a jury, and should never be given, lest they may produce the impression that the judge himself questions the veracity of the accused. The portions of the instruction referred to embrace, as a matter of fact, mere commonplaces, or propositions with which the most ordinary understanding should be familiar. The truth is that the criticised language of the instruction does not accurately state the proposition which it purports to express,

for it is the duty of the jury to *act* upon the defendant's testimony in any event, either by accepting it as truthful or rejecting it as unworthy of belief, or by giving it some weight or no weight. What was really intended to be expressed by the language referred to, however, was probably this: That, if the jury believed the defendant's story, he would be entitled to an acquittal, and if they did not believe it, they should, in reaching a conclusion upon the question of his guilt or innocence, reject it. If a jury of citizens could be found in this enlightened day and generation who would not know, without being told, that it would be their duty to reject testimony which they did not believe, or, if they did believe it, to give it due weight and so let it perform its proper function in the determination of the final result, it would indeed be necessary to declare that there had been a noticeable as well as lamentable decline in the efficacy of the jury system as an instrumentality for the administration of public justice. If, however, it could justly be said that the language of the instruction is misleading, or, as we believe to be true, does not accurately expound the rule so sought to be explained, and even if to some extent it may be obnoxious to the other objections made against it, yet we cannot say that the defendant suffered any prejudice by the submission of it to the jury; or, considering all the evidence, that a miscarriage of justice followed from it. (Const., art. VI, sec. 4½.) The record upon the whole shows that the accused was given a fair trial, and the evidence of his guilt appears to be clear and convincing, and we cannot persuade ourselves that the instruction, even though, as is further said of it, it singles out the defendant from among the many witnesses testifying, and so refers solely to his testimony, could have affected the verdict. (*People* v. *Loomis,* 170 Cal. 347, 351, [149 Pac. 581]; *People* v. *Weston,* 169 Cal. 393, 396, [146 Pac. 871]; *People* v. *Stephens,* 29 Cal. App. 621, [157 Pac. 570, 572]; *People* v. *Burns,* 27 Cal. App. 237, [149 Pac. 605].)

5. The defendant requested an instruction stating that the law recognizes two classes of evidence, upon either of which, if legally sufficient in the degree of its persuasiveness in probative force, a jury may lawfully find an accused guilty of crime, to wit, direct and circumstantial evidence. In allowing and giving the instruction the court added thereto the following language: "Such circumstantial evidence may con-

sist of incriminating admissions made by one accused of crime, plans laid for the commission of the crime by the accused, such as putting himself in a position to commit it; in short, any act, declaration, or circumstance admitted in evidence tending to connect the accused with the commission of the crime.''

It is claimed by the defendant that, in thus modifying the instruction and as so modified reading it to the jury, the court instructed upon matters of fact. We do not so view the instruction as given. It is general in form, and makes no special reference to the case in hand, is abstractly correct in stating the nature and elements constituting circumstantial evidence, and, indeed, like the instruction first above considered, involves only the statement of propositions coming within the range of common knowledge, and which should be obvious to every person possessing common intelligence.

We have found no prejudicial error in the record, and the judgment and the order appealed from are affirmed.

Chipman, P. J., and Burnett, J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on July 5, 1917.