[Crim. No. 601.   Third Appellate District.—September 30, 1922.]

THE PEOPLE, Respondent, v. JO FONG et al., Appellants.

[1] CRIMINAL LAW—ALIBI—CONFLICT OF EVIDENCE—APPEAL.—Where in a criminal case there is a decided conflict in the evidence on the defense of an alibi, it is not within either the province or the power of the appellate court upon appeal from the judgment of conviction to declare that the jury should have accepted the testimony presented by the defendant in support of his claim in preference to the testimony presented by the people tending to establish his guilt.

[2] ID.—MURDER—KILLING OF MEMBER OF CHINESE TONG—EVIDENCE—SIMULTANEOUS ASSAULT ON ANOTHER.—In the prosecution of members of a Chinese tong or society for the murder of a member of a rival tong, evidence that almost simultaneously with the shooting of the deceased another member of the tong of which the deceased was a member was shot at and wounded was proper as tending to

show a preconceived and prearranged design on the part of the defendants to act in concert in the destruction of the life of any member of the rival tong with whom they might come in contact.

[3] ID.—MEMBERSHIP IN TONG.—Where in such a prosecution testimony was received which afforded the inference that the tong of which the deceased was a member and the tong to which the defendants belonged were previously to and at the time of the homicide hostile to each other to a fighting point, it was proper to permit the district attorney, upon the theory that the shooting of the deceased was the outcome of a feud existing between the two tongs, to show that the defendants were active members of their tong and occupied official positions therein.

[4] ID.—MEMBERS OF HIGHBINDERS' BRANCH OF TONG.—Where in such a prosecution it was shown that the defendants were members of one tong and the deceased a member of another and that hostilities existed between the two tongs, it was proper to permit the district attorney to go fully into the question as to whether the defendants were "gun men" or members of the highbinders' branch of their tong.

[5] ID. — CROSS-EXAMINATION AS TO MEMBERSHIP IN TONG.—Where in such a prosecution one of the defendants testified in chief that he was not present at the scene of the homicide at the time it occurred and declared that he had no connection whatever with the commission of the act, it was proper cross-examination, in view of the testimony of the existence of a feud between the tongs, for the district attorney to ask the defendant as to his connections with the tong and whether he was a member of and active in the "binders" branch of the organization, since such examination was pertinent as tending to show interest and also as tending to impeach his statement that he was not a participant in the shooting.

[6] ID.—REMARK OF COURT—RULING ON OBJECTION TO EVIDENCE—MEANING OF WORD "BINDERS."—In such a prosecution it was not misconduct on the part of the court in ruling on an objection to a question by the district attorney on cross-examination of one of the defendants as to whether such defendant belonged to the "binders" society of the tong to state that the word "binders" was an abbreviation of the word "highbinders," and that evidence had been introduced tending to establish the existence of a tong war in the city of the homicide, but that it was for the jury to say whether such fact had been proven.

[7] ID.—REMARKS OF DISTRICT ATTORNEY—ARGUMENT — REFERENCE TO DEFENDANTS AS "GUN MEN."—In such a prosecution remarks by the district attorney in his argument to the effect that "the first great fact in this evidence is that the gun men from other towns came to the local headquarters" the evidence warranted the deduction of his theory of the existence of a tong war and that the defendants were professional "gun men."

[8] ID.—EVIDENCE—CARTRIDGE SHELLS—CONNECTION WITH DEFENDANT. In such a prosecution it was not error to receive in evidence cartridge shells found a week after the homicide in the stove in the gambling house where one of the defendants had placed them on the night of the killing, since the objection to their admission that they might have been placed therein by some other person went to the weight rather than to the competency of such evidence.

[9] ID. — PURPOSE OF VISIT OF DEFENDANTS TO CITY OF HOMICIDE. — Where in such a prosecution it was the theory of the people that the defendants, who resided elsewhere, went to the city in which the homicide occurred for the purpose of committing such crime, it was proper to admit the testimony of witnesses, other than the defendants, tending to show that they went there on legitimate business, but the exclusion of evidence that one of the defendants went to such city in response to a letter to come and take employment was without prejudice, where the letter was not produced or its contents proven, and there was evidence that defendant was one of the parties who went to the place where the homicide occurred.

[10] NEW TRIAL—NEWLY DISCOVERED EVIDENCE.—Where a motion for a new trial is merely based upon the ground of newly discovered evidence which is cumulative of evidence which was presented at the trial, it is entirely within the discretion of the trial court to say whether such motion shall or shall not be granted, and where in such case such court has refused to grant it, the reviewing courts will not interfere with the order unless it clearly appears that there has been an abuse of discretion.

APPEALS from a judgment of the Superior Court of Yuba County and from an order denying a new trial. Eugene P. McDaniel, Judge. Affirmed.

The facts are stated in the opinion of the court.

Le Compte Davis, A. F. MacDonald, W. E. Davies and Bond & Deirup for Appellants.

U. S. Webb, Attorney-General, and J. Charles Jones, Deputy Attorney-General, for Respondent.

HART, J.—The appellants and one Fred Fong were jointly informed against by the district attorney of Yuba County, in the superior court of said county, for the crime of murder, alleged to have been committed on the thirtieth day of July, 1921, and were jointly tried under said information. At the conclusion of the taking of the testimony on behalf of the people, the information, in

so far as it concerned Fred Fong, was dismissed and said defendant discharged. The jury found each of the other defendants guilty of murder of the first degree, but in each case fixed the punishment at imprisonment in the state prison for life. (Sec. 190, Pen. Code.)

Each of the defendants appeals to this court from the judgment of conviction and the order denying him a new trial. All the appeals are based upon the same record, which appears here according to the alternative method.

The party whose life is alleged to have been unlawfully taken by the defendants was a Chinese by the name of Ng Shea Wah, also known as Sing Binney. The homicide occurred at the Chong Wo Company store on the northwest corner of First and C Streets, in the city of Marysville, near the hour of 10 o'clock P. M. of July 30, 1921. The building in which the tragedy occurred is in the Chinese quarters of said city.

The defendants set up an alibi, claiming that they were not present at the scene of the shooting at the time that it occurred. A vast amount of evidence was received both against and for the defendants. It would subserve no useful purpose to enter into a detailed recapitulation herein of the testimony received. It will be sufficient to state generally the facts which the jury could well have drawn from the testimony as produced by the people and upon which, obviously, they founded their verdicts against the accused. In this connection, it may be stated that counsel for defendants in their opening brief, at the outset thereof, virtually admit that the testimony upon the question of the guilt of the defendants is in pronounced conflict, but declare that the jury would have been equally justified upon the evidence as a whole in finding the defendants not guilty as they were in reaching the conclusion which is responsible for these appeals, and that for this reason certain rulings of the court in admitting certain testimony and certain alleged misconduct by the district attorney in his argument to the jury must be held to have been so prejudicial to the substantial rights of the accused as to require this court to declare that but for such errors a different result would have been reached as to each of the defendants. In the concluding part of their brief, however, said counsel declare, with much emphasis, that

"the evidence of the plaintiff [meaning the people], taken at its best, is absolutely insufficient upon which to base verdicts of guilty against certain if not all of the defendants." And this is the point first urged and discussed in their briefs. We may as well at this place express the opinion that, after a careful examination of the testimony, as it is presented here, there is sufficient evidence supporting the verdicts as returned, albeit it is to be conceded there is a positive and direct conflict upon this proposition between the testimony given in behalf of the people and that presented by the defendants in support of their asserted alibi.

The facts as revealed by the testimony of witnesses introduced by the people may thus be stated: The deceased and the defendants were members of rival tongs or Chinese societies, the former of the Suey Sing tong and the latter of the Hop Sing tong. The headquarters of the Marysville branch of the Hop Sing tong were in a building adjoining the store in which the deceased was killed. On the night of the 30th of July, 1921, between the hours of 9 and 10 o'clock, the sheriff of Yuba County had occasion to visit the Chinese quarters of the city of Marysville on official business. He took his seat on a bench, with two Chinese who were acquaintances of his, in front of the Hop Sing building. He remained there for about twenty or twenty-five minutes, engaged in conversation with the Chinese sitting beside him. During that time Jo Fong, one of the defendants, was seen to come from the Hop Sing tong building to the sidewalk and stand and look about for a short time and then return to the building. Jo Fong repeated this conduct some three or four different times while the sheriff was sitting on the bench in front of said building. Shortly before 10 o'clock, whether prior to or after the sheriff left the place where he had been sitting and engaged in conversation with the Chinese does not clearly appear, the deceased stepped into the store of Chong Wo, which, as we have seen, adjoins the Hop Sing building. After the sheriff had left Chinatown, Jo Fong stepped out of the Hop Sing building and went to the store of Chong Wo and looked in and thereupon retraced his steps to the Hop Sing building, went inside and immediately returned to the side-

walk, followed by the other defendants.    Tom Yu, Wong
Ai, and Lee Ping took positions on the sidewalk near
said store and Jo Fong and Gin Wah stepped to the door
of the store and immediately began shooting at the de-
ceased.   At the time this occurred there were in the
store Chin Yook, the manager, Mrs. Wy Lung, Wong Shea,
and the deceased, Ng Shea Wah, who, when attacked,
was engaged in counting some money which he desired
and intended to deposit with Chin Yook. Some four or
five shots were fired, three of which entered the body of
the deceased, one passing through the upper lobe of the
right lung and another entering at the juncture of the
clavicle and the breast-bone and shattering ''the inner
end of the clavicle, the carotid and jugular vessels, and
piercing the right lung and making its exit to the right
three inches from the tenth dorsal vertebra.''   The death
of Ng Shea Wah followed almost instantly.  The wounds
were inflicted by Luger bullets from 9 millimeter Luger shells.
Wong Shea received a bullet wound in the neck and also
one in the leg,˙ but these wounds were not fatal.  Chin
Yook positively identified Jo Fong and Gin Wah as two
persons who entered the store together with weapons in
their hands.  He testified, though, that as soon as the
shooting began he dropped down under the counter and
that he saw Jo Fong firing his weapon but did not see
Gin Wah do any shooting.  Mrs. Wy Lung witnessed the
shooting and testified that Jo Fong and Gin Wah did
it.   Immediately after the shooting ceased, Jo Fong and
Gin Wah hurriedly left the store and with the revolvers
still in their hands ran toward the door of the Hop Sing
tong building at 113½ C Street.  Gin Wah was in the
lead and got inside the door first.  Jo Fong ran a few
doors farther on and then ran back to the Hop Sing
building and attempted to open the door through which
Gin Wah had just previously passed, but found it locked.
He thereupon, so a witness testified, ran to No. 115
C Street to the door of Hong On Wo and went in, thus
disappearing from .the street.
  One Wah Poon, a member of the Suey Sing tong, just
before Jo Fong and Gin Wah made their appearance in
the store of Chong Wo, left said store, where he had been
for some minutes, and started east on C Street.  Just as

he was about to pass Tom Yu, Lee Ping, and Wong Ai, who were standing on the sidewalk near the Chong Wo store, the sound of the shooting was heard. Wah Poon started to run, when he was shot at, according to his own testimony, by Wong Ai. He ran down C Street toward the levee, and, according to the testimony of Wah Poon and other witnesses, he was pursued by Tom Yu and Lee Ping, who shot at him several times, wounding him in one of his legs. Wah Poon fell to the ground and the pursuing Chinese fled in another direction. It is in evidence that immediately after the shooting Wong Ai ran into a gambling house on C Street near the Hop Sing building and took the empty cartridges from his revolver and threw them into a stove; that he reloaded his revolver and said he was going to kill "those Suey Sing s——ns of b——s." It should here be stated that the objection of the defendants to this testimony was sustained as to all the defendants except Wong Ai and that the objection to the testimony relating to the pursuit of Wah Poon was sustained as to all the defendants except Tom Yu, Wong Ai, and Lee Ping.

Shortly after the shooting the officers found Jo Fong sitting between some barrels and the wall of a building in an alley back of the Quong Hop Wo store, between First and Second, C and D Streets. The barrels shielded Jo Fong from observation, but a careful search revealed his presence to the officers and he was then placed under arrest. The officers also found on top of one of the barrels a 38 Smith & Wesson special blue seal revolver, which was introduced in evidence and identified by the officer making the arrest as having been the weapon he found at that time. The weapon was fully loaded. That same night and a short while after the shooting Wong Ai was arrested in the store of Sing Fat, near the corner of Third and C Streets. The officers then went to the Hop Sing building and found the door at the head of the stairway locked. A Mr. Wallace was with the officers and opened the door with a pass-key. The officers then passed through several rooms in the building and finally came to a room the door leading into which was locked. They knocked, but no response was made, and the officers then "kicked in" the door and found the room in dark-

ness. Searching the room, however, they found Gin Wah and Lee Ping, fully dressed, sitting on a "board arrangement" made for a couch, and placed them under arrest. They found no weapons on these defendants or in the room. The officers went to the Quong Hop Wo Company store about 12 o'clock at night. They knocked at the back door but received no response. Then one of the officers unlocked the door with a pass-key. They passed through the kitchen to another room and knocked on the door but received no response. It was a small room used for sleeping purposes. In that room they found Ah Lee with three or four other Chinese. In the adjoining room they found the defendant Tom Yu with two other Chinese, and Tom Yu was placed under arrest. A search was made of the room and they found a grip containing a 7 millimeter Luger revolver, a 32 automatic Colt's revolver and a package of 9 millimeter cartridges, which, however, cannot be used in a 7 millimeter revolver. Just outside of the door of the room in which Tom Yu was found the officers picked up a 32 caliber Smith & Wesson special revolver.

The above statement of the facts is, as before suggested, taken from the testimony of witnesses, several of whom testified to having been eye-witnesses to the tragedy and other circumstances immediately connected therewith. There were in addition to these facts a number of corroborating circumstances brought out by evidence produced by the people. Among these reference may be made to the testimony of a Chinese witness that, about a week after the homicide occurred, he went to the gambling house and examined the stove into which witnesses had testified Wong Ai had thrown some empty cartridges, and therein found several empty shells, which were introduced in evidence.

As already stated, the defendants each claimed and testified that, although in the city of Marysville on the night of the homicide, he was not present at the Chong Wo store when the shooting took place, but was at some other place in said city.

Wong Ai stated that, at the time of the shooting, he was not at the store of Chong Wo, but was in the building at First and C Streets, in which he at that time resided. He

said there were five other Chinese in the room with him
and that they heard the shots fired and that one of the
Chinese immediately closed the front and the rear doors
to the building. After that all of them went back to the
room in which they were sitting when the shots were fired
and sat down. He stated that one of the Chinese present
with him at the time telephoned for an automobile and that
the machine drove up to the building and he with the
other Chinese were driven to the Sing Fat store. He ad-
mitted having a revolver on him at the time of his arrest,
but stated that, having heard the shots and not knowing
what the shooting meant, he put the revolver on his per-
son just before getting into the automobile.

Jo Fong stated that he was a resident of Colusa, but went
to Marysville on the twenty-eighth day of July, 1921, in
response to a letter from a Chinese residing in Sacramento,
Lee Gnin by name, requesting Fong to meet him (Lee
Gnin) in Marysville on that day. He admitted having
been in Marysville on the night of the 30th of July, 1921;
that early in the evening of the 30th he went to the elec-
tric railway station near the Western Hotel, Second and D
Streets, in the city of Marysville, to see if his friend had
arrived from Sacramento, and that upon going to the station
he learned that the train had already passed through. He
then, so he stated, started back toward Chinatown on Sec-
ond Street and walked as far down as C Street, when he
observed a personal acquaintance by the name of Jo Tuck
standing in front of a Japanese store on the opposite side
of Second Street; that he hailed Jo Tuck and at the same
time crossed Second Street and stood talking with Tuck
until the shots were heard and the firing had ceased; that
he thereupon walked up as far as Fourth Street and re-
turned "home by way of an alley"; that he attempted to
get in to his place of abode by way of a back door but
the door was locked; that he thought he heard some noise
at the door and "did not know whether they were Ameri-
cans or Chinese coming through the door," so then "I
took the gun out of my pocket and put it in a barrel and
put a brick on it. Then it happened two policemen came
out of that door and I ducked behind the barrel." He
denied ever owning or using a Luger revolver and declared
that he carried the weapon that he attempted to hide in

the barrel because he had money and valuables on his person and was apprehensive that someone might try to rob him.

Gin Wah testified that he had been a resident of Colusa about three months before the time of the trial and that he went to Marysville on the 27th of July, 1921, and that he was there on the night of the homicide; that his object in going to Marysville was to be present at the election of a president of the Hop Sing tong. At the time the shooting took place, he said, he was in the Hop Sing tong building, sitting out on the upper porch with several other Chinese. When the firing began he and the other Chinese stood up and looked over the porch toward the direction from which the sound of the shots proceeded. He said he saw two men run out of the Chong Wo store but that he did not know who they were.

The defendant Lee Ping stated that he resided at San Jose, and in the month of July, 1921, went to San Francisco, and from there to Marysville, arriving at the latter place about 1 o'clock P. M. on the day of the homicide. On arriving in Marysville he went to a butcher-shop conducted by a Chinese named Wong and a relative of Tom Yu. He and Tom Yu were together at the butcher-shop for a while and then went to the Hop Sing tong headquarters, and that he was with Tom Yu, Gin Wah, and other Chinese sitting on the upper porch of the Hop Sing building when the shooting occurred. He stated that he never was in Chong Wo's store and that he did not have a weapon on him that night.

Tom Yu testified that his home was at 140 Waverly Place, San Francisco; that he was a cook by occupation, and that he, in company with Lee Ping, left San Francisco on the 30th of July, 1921, and went to Marysville, arriving there a little after the noon hour. He stated that he went to Marysville in response to a letter from one Wong York asking him to go to that city to work for him. He stated that he and Lee Ping early in the afternoon went to the Hop Sing tong building and were out on the upper porch with other Chinese for a short while; that thereafter he went to Quong Hop Wo's place, leaving Lee Ping, Gin Wah, and another Chinese on the porch of the Hop Sing tong building. He had a drink of tea at Quong Hop Wo's,

and, being tired from the long ride that he had had that day, retired to bed a few minutes before 10 o'clock; that after he had lain in bed for a few minutes he arose and stood by a table smoking, when he heard a number of shots fired; that one Toy Din, who was also in the building, closed the door and he with other Chinese remained in there for about half an hour, after which he left the building and went to see his friend and cousin, Wong York, at Fong On's. He found Fong On's place closed and he finally returned with some other Chinese acquaintances, whom he had met on the street, to the Quong Hop Wo building, where he was arrested.

The testimony of each of the defendants was corroborated by the testimony of other witnesses. As to the circumstance of the pursuit and shooting of Wah Poon, there was testimony introduced by the defendants to the effect that the parties who assaulted said Wah Poon, after the assault was committed, ran to an automobile ·stationed near First and D Streets, jumped into it, and that the machine was driven rapidly across the bridge spanning the Yuba River.

[1] It will thus be noticed that there is a decided conflict in the evidence upon the ultimate question in the case. It was, of course, a matter entirely with the jury to decide upon which side the truth prevailed. It was within the exclusive province of the jury to determine the question of the truth or the falsity of any testimony brought to their attention, and the verdicts returned stand as indubitable evidence that the jury believed the witnesses for the prosecution and disbelieved the testimony offered in support of the alibi set up by each of the defendants. Obviously, this court cannot say that the jury reached an erroneous conclusion from the testimony. In other words, it is not within either the province or power of this court to declare that the jury should have accepted the testimony presented by the defendants in support of their claim of an alibi in preference to the testimony presented by the people tending to establish their guilt. But it is argued that the testimony fails to show that Tom Yu, Wong Ai, and Lee Ping were in any way connected with the commission of the crime. It is true that it is not shown by the testimony that the defendants named took part in the actual act of killing the deceased. But, as shown, there is testimony

that Jo Fong, after having looked into the store of Chong Wo, immediately went into the Hop Sing building and returned to the sidewalk, followed by the other defendants, one of whom accompanied him to the door and took part in the shooting and the other three, armed with weapons, stood on the sidewalk near the door leading into the store, as if on guard. From this testimony, and the further testimony that a Suey Sing man who had just left the Chong Wo store was pursued and shot at by Tom Yu, Wong Ai, and Lee Ping, and wounded by a bullet from a pistol in the hands of some one of the three, the jury could have justly inferred, as undoubtedly they did infer, that the killing of Ng Shea Wah was the culmination of a conspiracy previously formed between all the defendants. Indeed, no one could read the entire testimony in this case without coming to the conclusion that there was on in the city of Marysville what is commonly known as a tong war between the Hop Sing society and the Suey Sing society, and that the killing of Ng Shea Wah and perhaps the intention to kill other members of the Suey Sing tong were part of the program mapped out by the Hop Sing tong men. The jury could have regarded as a circumstance of singular importance as in proof of a conspiracy between the defendants to take the life of Ng Shea Wah the conduct of Jo Fong, during the time that Sheriff McCoy was sitting on a bench in front of the Hop Sing building, in stepping out several different times from said building to the sidewalk, remaining in front but a second or so and then returning to the inside of said building, and then, after the sheriff had left the bench, going to Chong Wo's store, looking in and thereupon returning into the Hop Sing building and immediately going back to the sidewalk and thence to the Chong Wo store, followed by the other defendants.

[2] Of course, none of the defendants was on trial in this case for the assault upon Wah Poon, but the fact that said assault was made upon a member of the Suey Sing society by three of the men who immediately followed Jo Fong from the Hop Sing building after the latter looked into the Chong Wo store, and that it occurred almost simultaneously with the shooting of Ng Shea Wah, was important and proper in that it tended in some measure to show a preconceived and prearranged design on the part

of the defendants to act in concert in the destruction of the life of the deceased or any other member of the Suey Sing tong with whom they might come in contact. The fact is emphasized, however, that while a number of weapons of a different make were found either in the possession of the defendants or in the rooms in which they were apprehended after the homicide, no 9 millimeter Luger revolver, by means of which the killing was accomplished, was found in the possession of the defendants or in the rooms in which they were arrested. But this was a matter for the jury to consider and account for in their deliberations upon the evidence. The jury had the right to, and probably did, conclude that the weapon with which the homicide was committed was disposed of by the party using it after he had fled from the scene of the tragedy.

The remaining assignments involve attacks upon certain rulings whereby certain evidence was allowed to go before the jury. These will now be considered.

[3] 1. Upon the theory that the shooting of the deceased was the outcome of a feud existing between the Hop Sing tong and the Suey Sing tong, the district attorney sought and was permitted to show that the defendants were members of the first-named tong and were active in the prosecution of its general purposes, it having been shown that the deceased was a member of the Suey Sing society. As before observed, there was received into the case some testimony which afforded the inference that the two tongs were previously to and at the time of the homicide hostile to each other to a fighting point. The very fact of the killing of a member of the Suey Sing tong by members of the Hop Sing tong, and the further fact that Wah Poon, also a member of the Suey Sing tong, was pursued and shot by members of the Hop Sing tong at the very time the homicide occurred in Chong Wo's store, themselves constitute very strong circumstances as in proof of the existence of a feud between the two tongs. Furthermore, the statement by Wong Ai that they would kill all Suey Sing men, referring to them by an opprobrious epithet, while not evidence as against the other defendants in so far as the proof of the crime charged in the indictment was concerned, was, nevertheless, some evidence of the fact that a general war was on at the city of Marys-

ville between the two Chinese societies named. And there was other testimony further tending to show that a very bitter hostile feeling existed between the two tongs. It was, therefore, proper that the district attorney should have been permitted to show that the defendants were active members of the Hop Sing tong and occupied official positions therein, as was true at least as to one of them. But it is objected that the district attorney was allowed to go so far as to question witnesses as to whether the defendants were gun men or members of the highbinders' branch of the Hop Sing tong. One of the witnesses for the prosecution, a member of the police force of San Francisco, testified that he had seen one or two of the defendants quite often, one being the defendant Jo Fong, at the meeting of the "binders" organization of the Hop Sing tong in San Francisco, by which undoubtedly he meant "highbinders" organization. It is now, and has been for many years, a matter of such common notoriety that there are what are known as Chinese highbinders that the definition of the term "highbinder" has been given in Webster's New International Dictionary in part as follows: "A more or less loosely organized band of Chinese criminals in the Chinese quarter of an American city, who are frequently hired as bravos to commit assassinations or other outrages." It is also equally a matter of common knowledge that the Chinese tongs generally maintain in connection with their organizations "highbinder branches" thereof composed of Chinese who are willing to execute orders made by the tongs for the killing of members of hostile tongs whenever differences arise between them and such extreme measures are conceived to be necessary by the tongs to accomplish in full their purposes. [4] We can, therefore, perceive no good reason why the prosecution in this case, having shown that the defendants were members of one of these Chinese tongs and the deceased a member of another, and that hostilities existed between the two tongs, should not have been permitted to go fully into the question whether the defendants were or were not professional highbinders or men who were professionally engaged in the business of carrying out such infamies of the tong to which they belonged as they were required or employed to do by such tong. [5] A specific objection is made, however,

that the questioning of Jo Fong by the district attorney as ·
to whether he was a member of the Hop Sing tong and
of the highbinders' branch of that organization was not
cross-examination. The defendant testified in chief that
he was not present at the scene of the homicide at the time
it occurred and declared that he had no connection what-
ever with the commission of that act. This amounted to an
explicit denial of his guilt of the crime with which he
was charged. We think that, in view of the testimony as
to the existence of a feud between the tongs here in ques-
tion, as above explained, and in view of the further fact
that the defendant denied his complicity in the commission
of the crime charged, it was proper cross-examination for
the district attorney to ask said defendant as to his con-
nections with the Hop Sing tong and whether he was a
member of and active in the "binders" branch of that or-
ganization. The cross-examination was pertinent as tend-
ing to show interest and also as tending to impeach the
statement of Jo Fong that he was not present at and
participated in the shooting. (*People* v. *Rozelle,* 78 Cal.
84 [20 Pac. 36]; *People* v. *Fong Ching,* 78 Cal. 169 [20
Pac. 396]; *McGarry* v. *People,* 2 Lans. (N. Y.) 227, 19
Am. Rep. (footnotes) 348; *State* v. *Bartmess,* 33 Or. 110
[54 Pac. 167, 171]; *State* v. *Gallo,* 18 Or. 423 [23 Pac.
264]; *People* v. *Fealy,* 33 Cal. App. 605 [165 Pac. 1034].)

[6] 2. It is next contended that the court and the district
attorney were guilty of misconduct in the presence of the
jury because of certain remarks made by those officers,
the former in ruling upon the objection by counsel for the
defendants to the testimony last above referred to and the
latter in his argument before the jury. The court in rul-
ing upon the objection by counsel for the defendants to the
question propounded on cross-examination by the district
attorney to Jo Fong whether he (said Fong) belonged to
the "binders society of the Hop Sing tong on the 30th of
July, 1921," stated that "the word 'binders' is an abbre-
viation of the word 'highbinders,' which is the word in
common use and which is commonly understood." The
court further said that there had been evidence introduced
tending to establish the proposition that a so-called tong
war existed in Marysville on the night of the homicide,
but that it was for the jury to say whether that fact had

59 Cal. App.—18

or had not been proved. Counsel excepted to this statement by the court and the latter proceeded: "I could base the claim upon the statements and admission of counsel themselves in court, as to one circumstance, if I desired to argue the matter with counsel, but I am not passing upon the ultimate fact as to whether or not it has been proven. That is for the jury to say. I say there has been evidence, circumstantial evidence as well as some other evidence, to establish the fact that at the time of the shooting there was an outbreak which has been described as a tong war between the Hop Sing and the Suey Sing societies in the city of Marysville. Whether it was or not, that is a matter for the jury to determine."

First taking up this particular assignment, we have to say that we see nothing in the remarks of the court which were improper or which were calculated wrongfully to prejudice the rights of the accused. A trial court has the right—indeed, it is often necessary to do so, when ruling upon objections to proffered evidence—to state the evidence which has already been received. And this is all that the court in this instance did, taking the pains, however, to repeatedly declare that whether the fact to which the evidence stated by him related was or was not proved was a matter for determination by the jury. [7] The remarks by the district attorney objected to by counsel for the defendants were made while that officer was arguing the case to the jury, and were to the effect that "the first great fact in this evidence is that the gun men from other towns came to the local headquarters." The prosecutor went on to say that it had been proved conclusively that there was a tong war and "that a tong war did break out on that night," referring to the night of July 30, 1921; that that fact was established by the circumstance of the shooting by Hop Sing tong men of a Suey Sing tong man on the street at about the time of the killing of Ng Shea Wah, referring to the shooting of Wah Poon. He then proceeded to say that if the jury desired to say "now and forever there shall be no more tong wars in the city of Marysville, God knows this evidence is overwhelming and you can put a stop to tong wars," etc.

We shall not attempt to follow the argument of counsel against the propriety of the remarks of the district at-

torney as above indicated. It is sufficient to say that we are of the opinion that the district attorney in making the criticised remarks was well within his rights as the prosecutor of the case. The evidence, as has been shown, clearly warranted the theory that a tong war existed in Marysville on the night of the 30th of July, 1921, and that the tragedy herein involved was the direct result thereof, and the prosecuting attorney was authorized to descant upon that theory, amplify it and present it to the attention of the jury as fully as he thought it necessary to do so, so long as he did not transcend the record or lug thereinto any fact or facts which were not shown or reasonably inferable from the testimony. His reference to the defendants as "gun men" was undoubtedly justified by the fact as it was established by the evidence. And the theory advanced by him that they were professional "gun men" of the Hop Sing tong was and is clearly deducible from the evidence as a whole, and it was, therefore, not improper for him to advance that theory in his argument to the jury.

[8] 3. It is objected that the court erred in receiving in evidence the cartridge shells which were about a week after the homicide found in the stove in the gambling house and which, it was shown, were placed therein by the defendant Wong Ai on the night of the killing of Ng Shea Wah. The argument presented here against the legal propriety of the ruling admitting in evidence said shells is that it was not shown that the circumstance of finding the shells in the stove was in any way connected with the defendant Wong Ai; that so long a time elapsed from the time that Wong Ai was seen to have put shells in said stove and the time of finding the same therein, that other persons, who were shown to have had access to the place where the shells were found, might have placed them in the stove. We think the circumstance constituted competent evidence and that the objection thereto goes to the weight rather than to the competency thereof. It was for the jury to determine, upon all the other circumstances connected with the circumstance of the placing of the shells in the stove and the further circumstance of the finding of them therein one week after Wong Ai had placed shells in said stove, whether he did place said shells in said stove and

if they so found, to pass upon the weight or significance of the fact as one among such others as in their judgment tended to connect Wong Ai with the commission of the crime. It may here be stated that the court allowed the testimony of this circumstance as to Wong Ai but sustained an objection to it as to the other defendants.

[9] 4. It was sought to be shown through the witness Wong York, the owner of a butcher-shop at the city of Marysville, that some days prior to the homicide he addressed a letter to Tom Yu, at San Francisco, where the latter resided, and requested him to come to Marysville and take employment in his (Wong York's) butcher-shop, and that in response to that letter said defendant went to Marysville on the day of the homicide, arriving there early in the afternoon of said day. The court sustained the objections of the district attorney to that testimony. The theory of the prosecution seems to be that the defendants, who resided elsewhere than in Marysville, went to that city for the express purpose of committing the crime charged in the information, and we think that testimony by witnesses other than the defendants themselves tending to show that the defendants went to Marysville on legitimate business at about the time of the homicide would have been proper, but in this particular instance the purported letter would have been the best evidence of the fact which Wong York was asked to testify to, and there is no showing that the letter was not in the possession of the defendant Tom Yu at the time of the trial and at the time this proof was sought to be made. Nor is there any evidence of the contents of the letter, and it is, therefore, impossible for us to say whether the letter really contained the request claimed for it by the defendants or was a letter upon some other subject. At any rate, it appearing that the defendant was in Marysville that day, and there being testimony that he was one of the parties who went with Jo Fong and Gin Wah to the place where the homicide occurred, we think the ruling of the court, even if erroneous, was without prejudice.

5. We have in effect disposed of the point that the court erred in allowing testimony describing the pursuit and shooting of Wah Poon. The contention of the defendants is that the testimony related to an independent and dif-

ferent crime from that with which the accused were charged. As before stated, the two transactions occurred almost at the same instant of time and were participated in by the persons who followed Jo Fong from the Hop Sing building to the place where the shooting occurred, the three defendants who attacked Wah Poon being stationed on the sidewalk near the store, from which circumstance the jury were entitled to draw the inference that the two occurrences were a part of the same general scheme of the Hop Sing defendants to attack Suey Sing men.

[10]    6. The point under this subdivision relates to the alleged misconduct of the district attorney in his argument to the jury. It is not necessary to specifically consider this point, inasmuch as what we have had to say above relative to the charge that the district attorney was guilty of misconduct in his argument is equally applicable to the point now under consideration.

7. The last point is that the court erred in not granting the motion of the defendants for a new trial on the ground of newly discovered evidence. The motion was made upon the affidavit of one of the attorneys for the defendants, and therein it was stated that one Edward Oscar Heinrich, of Berkeley, a firearm expert, had been, prior to the commencement of the trial of this case, called to the city of Marysville by the district attorney of Yuba County for the purpose of having him examine the Smith & Wesson revolver found in the possession of Jo Fong at the time of his arrest and which was introduced in evidence at the trial, and determine whether the same, at the time of the homicide, bore any evidence of having recently been discharged; that, notwithstanding that said Heinrich did go to Marysville and make the examination requested by the district attorney, the latter officer did not subpoena and introduce him as a witness in the case; that the affiant learned after the trial of this action that said Heinrich, upon examining the said Smith & Wesson revolver, informed the district attorney that if he were called as a witness in the case he would be compelled to testify that said weapon had never at any time been fired since it was cleaned; that said Heinrich told affiant that when he learned that the case had been tried he was surprised that the district attorney did not call him as a witness; that affiant requested

said Heinrich to make an affidavit involving the facts here set forth but that Heinrich refused to do so on the ground that he did not feel it would be ethical for him to make such affidavit; that if a new trial be granted in this case the defendants will upon a retrial subpoena and have present in court and so produce the testimony of said Heinrich.

The defendants introduced certain expert witnesses who testified that the said Smith & Wesson revolver bore no evidence of having been recently fired at the time it was taken possession of by the officers on the night of the homicide. The evidence of Heinrich would have been merely cumulative, and it is well settled that, where a motion for a new trial is merely based upon the ground of newly discovered evidence which is cumulative of evidence which was presented at the trial, it is entirely within the discretion of the trial court to say whether such motion shall or shall not be granted, and where in such case such court has refused to grant it, the reviewing courts will not interfere with the order unless it clearly appears that there has been an abuse of discretion. We have examined carefully all the points urged for a reversal and our conclusion is that the verdicts should not be disturbed.

Accordingly, the judgments and the orders appealed from are affirmed.

Burnett, J., and Finch, P. J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on November 27, 1922.

All the Justices present concurred.